283 P.2d 887

In re STATE of Utah, Respondent, in the INTEREST of Elsie Johnson BLACK, Emily Johnson Black, Vaughn Johnson Black, Ivan Francis Johnson Black, Wilford Marshall Johnson Black, Orson Johnson Black, Lillian Johnson Black, Spencer Leon Johnson Black, alleged neglected, dependent children, Appellants.

No. 8222.

Supreme Court of Utah.

May 16, 1955.

Horace J. Knowlton, Salt Lake City, for appellants.

E. R. Callister, Jr., Atty. Gen., Walter L. Budge, Asst. Atty. Gen., for respondent.

WORTHEN, Justice.

This is an appeal from a judgment of the Juvenile Court of the Sixth District in and for Washington County, Utah, adjudging the appellant children to be neglected children, depriving the parents, Leonard Black and Vera Johnson, also known as Vera Johnson Black, of the right of custody and control over said children, making the children wards of the Juvenile Court and awarding the right of custody and control over the said children to the Utah State Department of Public Welfare.

The following facts are undisputed or admitted:

The children above mentioned are issue of an unlawful polygamous marriage between Leonard Black and Vera Johnson. The children at the time of hearing ranged in ages from 17 to 2 years and they and their parents have resided at Short Creek, Washington County for many years.

The father Leonard Black has fathered three families and a total of twenty-six living children. He married his legal wife in St. George, Utah, sometime between 1925 and 1928; twelve children were born to her, eleven of whom are living. This family was raised in Short Creek, Arizona. The family of the third wife also lived in Short Creek, Arizona.

Short Creek is an isolated community straddling the Utah-Arizona border and situated about two-thirds in Arizona and one-third in Utah; it had as of July 24, 1953, a population of 200 to 300.

Leonard Black took Vera Johnson as a plural wife about 1934 or 1935. That marriage was pursuant to a religious marriage ceremony for which no marriage license was obtained. Leonard Black was not certain where the ceremony was performed.

After this community had quietly existed as a polygamous village for at least a quarter of a century, its peace and tranquillity were abruptly disturbed on the 24th day of July, 1953. At that time a raid was made by Arizona law enforcement officers and the families living on the Arizona side were taken into custody. The children and their mothers were taken away from the vicinity of Short Creek. The fathers who were arrested in Arizona were prosecuted.

The homes where Mr. Black's legal wife Verna and her 11 children lived was about a block from the home where the third wife Lorna Johnson and her 7 children lived. The home where Vera Johnson, mother of the 8 children mentioned in the petition before the Juvenile Court, lived was on the Utah side of Short Creek and about one mile from the homes of Verna Black and Lorna Johnson.

The original petition in this matter was filed the first day of August, 1953, and an amended petition was filed on March 19, 1954, and the hearing began March 20, 1954.

The petition alleged that the 8 children above mentioned were dependent and neglected, in this:

"(a) Through the fault of their parents, said children are destitute and without proper subsistence, clothing, medical care and other support and care necessary to their well-being.

"(b) That the parents of said children have and do now teach and encourage said children to believe in the practice of polygamy or plural marriage and that the children should enter into plural marriage in violation of the laws of Utah, all of which is injurious to the morals and welfare of said children.

"(c) That said children and their father, Leonard Black, and their mother, Vera Johnson Black, reside at Short Creek, Utah; that said father has and does now practice polygamy and unlawful cohabitation and is aided, abetted and assisted in so doing by said mother, all of which is injurious to the morals and welfare of said children."

Counsel for the parents denied the allegations (contained in subdivision (a) of the petition) that through the fault of the parents the children are destitute and without proper subsistence, clothing, medical care and other support and care necessary to their well-being.

Counsel then made observations which are (both an opening statement and) a confession that Leonard Black had been guilty but a denial that he is now guilty.

"I would like to say that Mr. Black is a man forty-eight years old, about to be forty-eight, that he has fathered three families, two are in the custody of the Arizona Court. The mother of the oldest family and the legal wife, Verna, is a woman in good health, forty-seven years of age, having eleven

living children, five of whom are living with their mother in Mesa, Arizona and are in the custody of the Arizona Court. Lorna, also in the custody of the Arizona Court, is thirty-one years old and is a strong, able-bodied woman. She has seven children, twelve to six months, and all are with her and are in the custody of the Arizona Court. Going back to the family of Verna, the children range in age from twenty-five to nine years of age. These two families are residents of Short Creek on the Arizona side. Vera is present with her eight children, which children range in age from eighteen years to two years, and she is a resident on the Utah side of Short Creek. She also is a strong and able-bodied woman and is thirty-six years old and as I have said is present here in Court.

"Mr. Black, we'll offer to prove, if it isn't stipulated, is an industrious man of high moral character and integrity. He has never failed to pay a bill and has never been sued on a bill. He is not now on relief with any of his families and has never been on relief except for a short period five years ago when he had a heart attack he did receive some help and assistance from Arizona at that time; never been arrested prior to this, if this is an arrest, and he has never been charged with any violation or any refraction of ordinance and his children taking them as a group, there being 26, twelve boys and fourteen girls, have never been charged with any act of delinquency; neither Mr. or Mrs. Black, Vera or Lorna or any of these children smoke or drink or use tobacco in any form. They have never been charged with any act of law breaking, except in this particular instance. They are all intelligent; they are people of high moral character and integrity and have good grades in their school work and are healthy and strong, well dressed and well clothed and have always been well fed. I think, your Honor, that is all I have to offer with reference to the first allegation.

"Now going to Allegation 'B' as it is called, that

" 'The parents have and do now encourage the children to believe in the practice of plural marriage, which is injurious to the morals and welfare of said children.'

"Your Honor, * * * We offer to admit that Mr. Black and his families were of a plural marriage origin, Mr. Black's grandfather being in the order of plural marriage, and the families of Vera and Lorna and Verna likewise, * * *. They have accepted further, as part of their doctrine and belief, that there is a law upon which every blessing is predicated. They believe that plural marriage and the law of United Order are separate prin-

ciples and they have elected, up to the 24th day of July, 1953, to obey those laws regardless of consequences to themselves. On or about the 24th day of July, 1953, there was a raid, as is well known in that part of Short Creek which is in Arizona and from that time there has been no teaching of plural marriage in this family or practice as far as Leonard and Vera are concerned. Mr. Black does not teach, preach, or practice the law of plural marriage or encourage his children to teach, preach or practice the law of plural marriage. We deny that there is any truth in the statement since that time.

"The Court: Do you admit that there was prior?

"Mr. Knowlton: Yes, sir.

"The Court: And since that time?

"Mr. Knowlton: It is the position of Mr. Leonard Black and Vera that their children should be allowed their free agency. They don't admit that they have taken any active steps to get their children to accept plural marriage, but they do admit that prior to that time they practiced it themselves."

At the conclusion of the hearing consisting largely of testimony given by Leonard Black and Vera Johnson and their two oldest children, the case was submitted to the court and thereafter and on May 11, 1954, the Juvenile Court made findings of fact and conclusions of law and entered its decree and judgment.

Among others the Court found the following facts:

"1. That the children subject of the petition herein are all issue of an unlawful polygamous marriage of Leonard Black and Vera Johnson, also known as Vera Johnson Black."

"3. That the father, Leonard Black, has fathered three families and a total of twenty-six living children.

"4. That Leonard Black is legally married to Verna Black, * * * That the said Verna Black, legal wife of said Leonard Black, is still alive and presently resides in the vicinity of Mesa, Arizona, where some of her children by Leonard Black are in the custody of the Arizona Juvenile authorities.

"5. That Leonard Black took Vera Johnson Black as a plural wife approximately nineteen or twenty years ago. That Vera Johnson Black became the plural wife of Leonard Black pursuant to a religious marriage ceremony performed by John Y. Barlow either at Hurricane or Short Creek, Utah. The parties secured no marriage license for this ceremony.

"6. That Leonard Black and Vera Johnson Black have unlawfully cohabited as man and wife continuously since their invalid plural marriage

* * * up to July 24, 1953. That said parties have associated together since July 24, 1953, but have not engaged in sexual relations.

"7. That Leonard Black now has a second plural wife, Lorna Johnson Black, the sister of Vera Johnson Black. That the said Lorna Black has had seven children as issue of her unlawful polygamous union with Leonard Black."

"11. That the majority of the adult residents of Short Creek are persons who, in recent years, have practiced and advocated plural marriage. * * *

"12. That Leonard and Vera Johnson Black and the majority of the adult residents of Short Creek are and have been members of an organized religious group. That the members of this religious group entertain a religious belief in substance and effect that there is a law *of God requiring men to take and live with more than one wife* and that failure to do so constitutes *a breach of religious duties.*

"13. That Leonard Black and Vera Johnson Black have both been aware that their living as man and wife constitute a violation of the Utah law. That Leonard Black and Vera Johnson Black have carried on such unlawful cohabitation in the belief that they were acting pursuant to a law of God which it was their duty to obey regardless of the fact that their conduct constituted a violation of the laws of Utah. That said parents have refrained from having sexual relations since July 24, 1953, not because they abandoned their religious beliefs, but out of fear of criminal or juvenile court action involving themselves and their children.

"14. That said parents, Leonard and Vera Johnson Black, have at no time counseled or advised any of their children to abide by the laws of Utah regarding polygamy, but on the contrary by their (the parents') own conduct and example in living in polygamy and by associating themselves with a religious group whose members practice and advocate polygamy have encouraged their children to become polygamists when they become of marriageable age.

"15. That of the twenty-six children fathered by Leonard Black and born to his three wives, six of said children are married. * * * Five of these six daughters are either plural wives themselves or are married to men who have plural wives. That at the time these daughters were married, Leonard Black had knowledge that they were marrying men who either practiced or believed in the practice of polygamy. That Leonard Black took no steps to discourage any of these daughters from their marriages.

"16. That there was no evidence that any of the children were destitute and without proper sustenance, clothing or medical care.

"17. That the home of Leonard Black and Vera Johnson Black at Short Creek, Utah, *is an immoral environment for the rearing of* said children.

"18. That Leonard Black, the father, and Vera Johnson Black, the mother of said children, have each *knowingly failed and neglected to provide* for said children the *proper maintenance, care, training* and *education* contemplated and *required by both law* and *morals*.

"19. That both the public welfare and the welfare of the children requires that the *right of custody and control* over said children be taken from their parents.

From the facts found the Court made the following:

"Conclusions of Law

"1. That the said children are *neglected children* within the meaning of Section 55–10–6, Utah Code Annotated, 1953.

"2. That Leonard Black and Vera Johnson, also known as Vera Johnson Black, parents, should be deprived of the right of custody and control of said children.

"3. That an order, judgment and decree be made and entered in the interest of said children making said *children wards of this Court and awarding the right of custody and control* over said children to the Utah State Department of Public Welfare."

Thereupon the Court ordered, adjudged and decreed (in part as follows):

"1. That the said children, subject of the petition herein and each of them, are hereby declared and adjudged to be neglected children within the meaning of the laws of Utah.

"2. That the parents, Leonard Black, father, and Vera Johnson, also known as Vera Johnson Black, mother, and each of them, are hereby deprived of the right of custody and control over said children and said children are hereby made wards of this Court subject to the continuing jurisdiction of the Court.

"3. That the right of custody and control over said children is hereby awarded to the Utah State Department of Public Welfare, and the Department is hereby authorized and instructed to place said children in suitable foster homes; provided however, that said children may remain in the actual custody of their parents upon the following conditions, and only upon said conditions, to-wit:

"(a) That the parents and each of them shall at all times comply with the

laws of Utah relating to marriage and sexual offenses.

"(b) That the parents and each of them shall at all times refrain from counseling, encouraging and advising the children to violate the laws of Utah relating to marriage and sexual offenses.

"(c) That the parents and each of them shall counsel and advise the children to obey the laws of Utah relating to marriage and sexual offenses. This requirement shall not be satisfied by the pretence of telling the children that they have 'free agency,' but it is intended that the parents shall affirmatively encourage their children to abide by the laws of Utah, and that the children should do so in disregard of any *religious* doctrines to the contrary.

"(d) That until further order of the Court, the parents and each of them, together with all of the children, shall report in person once each month to the probation officer or other designated representative of the Court of Short Creek, Utah, on the 25th day of each month commencing May 25th, 1954, unless such time and place of reporting be changed with the approval of the Court.

"(e) That until further order of the Court, the parents, and each of them, shall submit to the Court each month at the times mentioned in Paragraph (d) above, a written sworn statement stating whether or not he or she has complied with the conditions set forth in sub-paragraphs 3 (a) through (c) above, during the preceding thirty days.

"(f) That each parent shall file with the Court on or before May 25th, 1954, a sworn statement in writing to the effect that he or she is willing to comply with the requirements set forth in sub-paragraph 3 (a) through (e) above."

"6. The case is hereby continued until the 25th day of May, 1954 [sic], at which date, if the children have not sooner been returned to the custody of their parents, the Court shall determine whether or not the children should be returned to the custody of their parents or whether the parents should be permanently deprived of all rights of custody and the Utah State Department of Public Welfare authorized to place said children for adoption." (Emphasis ours.)

On May 12 the decree and judgment was served personally on Leonard Black and Vera Johnson (Black).

On June 4, 1954, the Juvenile Court ordered the children taken into custody forthwith as required by the decree and judgment entered May 11, 1954, appellants having failed to accept the terms and conditions specified in said decree.

The return of the Iron County Sheriff dated June 4, 1954, shows that the children were delivered to Lamar Andrus, Child

Welfare Consultant, Utah State Department of Public Welfare.

Appellant assails the findings and judgment in the following particulars:

1. The decree operates to take the custody of children from their natural parents without due process of law, because the court had no jurisdiction to enter the decree.

2. That Section 55–10–6, U.C.A.1953, under which the court found the children to be "neglected children" is unconstitutional in that it is vague and uncertain.

3. That Findings of Fact 14, 17, 18 and 19 are not supported by the evidence and the decree and judgment based on the findings of fact and conclusions of law is erroneous.

4. That the decree and judgment is unconstitutional and void in requiring the parents to swear that they are willing to comply with the requirements of sub-paragraphs 3 (a) through (e) as a condition to have the children left with them.

As we view the case we are required to pass upon these questions:

1. Is the decree and judgment void and in violation of the Fourteenth Amendment to the Constitution of the United States and Section 7 of Article I of the Constitution of Utah by taking the children from parents without due process of law?

2. Does the evidence justify the decree and judgment of the court that the children and each of them are neglected children within the meaning of Sec. 55–10–6, U.C.A. 1953?

3. Was the judgment of the Court in depriving the parents Leonard Black and Vera Johnson of the right of custody and control over said children and awarding the custody to the Utah State Department of Public Welfare justified under the facts in this case?

4. Was the decree and judgment unconstitutional and void in imposing the requirements specified in sub-paragraphs (a) through (f) of paragraph 3 thereof?

At the outset we deem it proper to make some observations. It is declared in Section 55–10–26, U.C.A.1953:

*"Proceedings to be informal, equitable rather than criminal.*—In all cases relating to the delinquency, neglect, dependency or other cases of children and their disposition the court shall be regarded as exercising equity jurisdiction. The court may conduct the hearing in an informal manner and may adopt any form of procedure in such cases which it deems best suited to ascertain the facts relating to such cases and to make a disposition in the best interest of such children and of the public. The general public may be excluded from the hearing of such cases. The court may hear evidence in the absence of such children, and may compel children to testify concerning the facts alleged in the petition. The court shall inquire into the home

environment, history, associations and general condition of such children, may order physical and mental examinations to be made by competent physicians, psychologists and psychiatrists, and may receive in evidence the verified reports of probation officers, physicians, psychologists or psychiatrists concerning such matters."

Juvenile Courts are established in pursuance of the authority vested in the Legislature by Article VIII, Section 1 of the Constitution of Utah. This Court early declared:

"Such laws are most salutary and are in no sense criminal and not intended as a punishment, but are calculated to save the child from becoming a criminal. The whole and only object of such laws is to provide the child with an environment such as will save him to the state and society as a useful and law-abiding citizen, and to give him the educational requirements necessary to attain that end. * * *"[1]

The purpose of establishment of Juvenile Courts was declared by the New York Court as follows:

"To reclaim, rehabilitate and salvage wherever possible, youth that may have violated moral sense, decent conduct and the law."[2]

With these observations we proceed to consider the questions set out above in the order stated.

The first question we are required to answer is the contention of appellants that the decree and judgment are violative of the Fourteenth Amendment of the Federal Constitution and of Section 7 of Article I of the Utah Constitution by taking the children from appellant parents without due process of law.

It may be observed that the Legislature enacted the law creating Juvenile Courts (in 1905) long before Leonard Black and Vera Johnson began their meretricious relations under an illegal marriage and long prior to the birth of any of the subject children. The parents of these children are charged with knowledge of the existence of the laws prohibiting polygamy and unlawful cohabitation now Sections 76–53–1 and 76–53–2, U.C.A.1953.

However, the record in this case is a complete answer to appellants' contention. All steps required by the provisions of Title 55, Chapter 10, U.C.A.1953 were complied with. A preliminary inquiry was made under the direction of the probation department, including a preliminary investigation of the home and environment and situation of the children as provided for in Section 55–10–13. A report in writing of that investigation was filed by the probation

1. Mill **v.** Brown, 31 Utah 473, 88 P. 609, 613.

2. In re Cotton, Dom.Rel. 30 N.Y.S.2d 421, 423.

officer. A petition was filed as required by Section 55-10-14. Said petition was verified and alleged in a general way the facts which bring the children within the jurisdiction of the court. It stated the names, ages and residence of the children, the names and residence of the parents. The proceeding was entitled, as required to wit: "State of Utah in the interest of ———— (naming the children) alleged dependent, neglected child." Following the verified petition and over the signature of the court is the following:

"Preliminary inquiry in the case having been made by the Probation Department of this Court, and it having been determined that the public interest or the interest of the children require that further action be taken, the filing of this petition is hereby authorized."

To vest the court with jurisdiction to make any order with reference to said children, except to dismiss the case, the court must find facts which show that the children were *neglected, dependent* or *delinquent* as defined by the statute.[3]

The statute specifies the method of obtaining jurisdiction over parents—Section 55-10-15 authorizes the court to issue a summons reciting briefly the substance of the petition and requiring the person having custody of the child to appear personally and bring the child at the time and place specified. The section also author-izes the issuance of summons to bring any other person whose presence the judge deems necessary.

This court in In re Graham, supra, said:

"It is fundamental that a juvenile court may make no valid orders in reference to a child unless and until that court obtains jurisdiction of that child by complying with the statutory requirements therefor. It is just as fundamental that a parent's right to the custody of his child cannot be determined so as to bind that parent unless and until the court obtains jurisdiction of that parent."

The record likewise shows that on the 20th day of March, 1954, Leonard Black and Vera Johnson waived service of summons and notice and consented that the matter be heard; the signatures of the parents were attested by the Juvenile Judge.

Throughout the hearing the record shows that the parents and the children were represented by counsel.

It is also established by the record that the appellants, both parents and children, were accorded due process of law; that they were fully advised of the charges and duly served in all respects as required by the statute and were all represented by able counsel both at the hearing before the Juvenile Court and on appeal to and argument before this Court.

3. In re State in Interest of Graham, 110 Utah 159, 170 P.2d 172, 175.

In view of the foregoing, the contention of appellants that the juvenile court took the custody of their children without due process of law cannot be sustained, unless the order is void for want of facts to support the same. That the court acquired jurisdiction to hear the matter cannot be doubted; but it is likewise clear that the facts found by the court must show that the children were neglected or dependent as alleged in the petition or the court lacks jurisdiction to make any valid order denying parents custody. The validity of the order in light of the facts found will be discussed under appellants' point two.

The second question we are required to answer is this: Does the evidence justify the decree and judgment of the court that the children and each of them are neglected children within the meaning of Section 55–10–6.

That section declares that "The words 'neglected child' include: ·

"A child who is abandoned by his parent, guardian or custodian.

"A child who lacks proper parental care by reason *of the fault or habits* of the parent, guardian or custodian.

"A child whose parent, guardian or custodian *neglects* or *refuses* to provide proper or necessary subsistence, education, medical or surgical care or other care necessary for his health, *morals or well-being.*

"A child whose parent, guardian or custodian neglects or refuses to pro-vide the special care made necessary by his mental condition.

"A child who is found in a disreputable place or who associates with vagrant, vicious or *immoral persons.*" (Emphasis ours.)

Counsel contends that the evidence does not justify the court's decree holding that the children are neglected within the meaning of the statute.

They likewise assail findings of facts 14, 17, 18 and 19, contending that they are not supported by the evidence.

Other findings made by the court which have a bearing on the decree are set out earlier in this opinion along with the court's complete findings of fact, conclusion of law and decree, as to them no complaint is made.

Finding No. 14 finds that the parents have at no time advised the children to abide by the laws of Utah regarding polygamy, but on the contrary they by their own conduct and example in living in polygamy have encouraged the children to become polygamists.

Finding No. 17 finds that the home of the appellants' parents is an immoral environment for the rearing of said children.

Finding No. 18 finds that the said parents have each knowingly failed and neglected to provide for said children the proper maintenance, care, training and education contemplated and required by law and morals.

Finding No. 19 finds that both the public welfare and the welfare of the children require that the right of custody and control over said children be taken from their parents.

Attention should be called here to finding No. 6 which finds that Leonard Black and Vera Johnson Black have *unlawfully cohabited* as man and wife continuously since their invalid plural marriage nineteen or twenty years ago up to July 24, 1953. That said parties have associated together since July 24, 1953, but have not engaged in sexual relations.

We are of the opinion and hold that the evidence abundantly supports the findings of fact assailed. The facts are established by the testimony of appellants and admission by them through the statement of their counsel, at the opening of the case.

Counsel for appellants in his opening statement admitted that Leonard Black had at the time of the hearing and at all times prior to and since his marriage to Vera Johnson had a legal wife living from whom he had not been divorced and who had 11 living children, 25 to 9 years of age. That 5 of his children were with his legal wife Verna Black at Mesa, Arizona, and in the custody of the Arizona Court. That he had two polygamous wives, Vera Johnson, mother of the 8 children involved in this proceeding, and Lorna Johnson, younger sister of Vera, and mother of 7 children. Lorna's 7 children, ages twelve years to 6

months, reside with her and are in the custody of the Arizona Court.

Counsel for appellants admitted that Mr. Black and his families were of *plural marriage origin;* that his grandfather was in the order of plural marriage, and that the families of all his wives were in the order of plural marriage; that they had all accepted as part of their belief that there is a law upon which every blessing is predicated; that they have elected up to July 24, 1953, to obey the laws of plural marriage regardless of consequences to themselves. That on July 24, 1953, there was a raid in the part of Short Creek which lies in Arizona; that since that time there had been no teaching of plural marriage or practice between Mr. Black and the mother of these children; that Mr. Black does *not teach,* preach or practice the law of plural marriage or encourage his children to teach, preach or practice the law of plural marriage. He admitted that prior to July 24, 1953, he did teach, preach and practice the law of plural marriage and *encourage his children to teach, preach and practice that law.*

The admission of counsel goes far to support the court's findings but parts of the evidence given by the parents and two oldest children should be mentioned.

Six of Mr. Black's daughters are married—all were under 18 when married and one was only 15. Five of his six married daughters are either polygamous wives or

wives of men who later took polygamous wives.

Leonard Black knew that his daughters were marrying into families that practiced plural marriage (polygamy). He did not discourage them nor did he advise his daughters that polygamous marriages constituted a violation of the laws of Utah.

Mr. Black gave strange testimony and such as a monogamous husband would not likely give. He testified that he doesn't remember when he married any of his 3 wives; he was not sure where he married the mother of the children before the court; knows that he got a license at court house in St. George to marry his first wife but he didn't get any license to marry his other two wives; he was not sure who his sons-in-law were.

Asked to whom his daughter Leta is married he answered, "I have no proof, but I think the alleged marriage was to Joe Barlow."

Mr. Black was examined and answered as follows:

"Q. Lets, just for the sake of clarification Mr. Black, who are the two daughters? A. Cleo and Leta.

"Q. Are they married to the same husband? A. It *is common knowledge,* but I have no proof.

"Q. You know whether they were living as husband and wife up until July 1953, and holding themselves out as being husband and wife? A. It was more or less a known fact.

"Q. They are not married to anyone else? A. No.

"Q. Do they have children? A. I think so.

"Q. And so far as you know, the father of the children is Joe Barlow. A. Yes."

The above testimony from a father claiming to have a deep-seated paternal interest in his children—willing to engage in the practice regardless of consequences to himself.

Mr. Black testified that since July 24, 1953, he had not engaged in sexual intercourse with Lorna and Vera; that he had pleaded guilty to a charge of conspiracy in the state of Arizona, and that he is presently under suspended sentence of one year in the State prison of the state of Arizona; that the condition of the suspension is that he refrain from living in plural relationship.

Mr. Black admitted that he knew that in living in plural marriage or unlawful cohabitation he is in violation of the laws of the State of Utah; refused to agree that he would not resume the unlawful relation with Vera and Lorna at end of suspended sentence. Mr. Black was asked the following question which he answered:

"Q. Mr. Black as one of the conditions in practicing the philosophy of plural marriage you have accepted, have you, a doctrine that if the law of the State of Utah, or of man contravenes what you conceive to be a law of

God, that preference is to be given to one of these laws. Now which would you give preference to in the future? A. The law of God comes before the law of man."

Mr. Black testified that none of his children had had any high school education.

Mr. Black testified that none of the houses occupied by his three wives had any inside plumbing, one had bathtub but no running water, it had a drain to drain it out, no sanitary facilities in the house. Describing the house where third wife lived Mr. Black testified: that the house consisted of two rooms. Kitchen and living room combined and one large bedroom. Six of the 7 children and wife sleep in the house in two large and one small bed for the younger boy.

"Q. Your wife occupied the same room as the children. A. That is right.

"Q. And when you would live in the house you occupied the same room as the children occupied? A. Yes that would be right."

Mr. Black admitted that in recent years most of the men and women in Short Creek have been involved in plural marriages.

The court asked the following questions and Mr. Black answered as indicated.

"Q. Now at the time your daughters married did you discuss their marriage plans with them? A. Well, not in detail, they understood the situation, it was their choice.

"Q. Did you know at the time your daughters discussed the problem with you, before they married that they were about to marry into a family where plural marriage was practiced? A. Partly true.

"Q. Did you know that in the case of five of your daughters, that they were marrying into a plural marriage family? A. I had some knowledge of it.

"Q. Did you discourage them from entering into those marriages? A. Not exactly.

"Q. You never discussed the legal aspect of their marriages with them, is that correct? A. Not to any great extent.

"Q. Did you to any extent? A. Only as to their choice, if they felt that he was the right man and they became of age.

"Q. Did you tell them that what they were about to do would be a criminal offense on the part of their husband and possibly of themselves? A. No sir.

"Q. Did you ever at any time advise any of your daughters not to go into a marriage that would constitute a violation of the Utah Law? A. I don't know as I did."

Vera Johnson, mother of the children testified: That her parents had fifteen children—8 girls and 7 boys; that her father is reputed to have more than one wife; he has more than one family—all of her sisters are married. We set out part of her examination:

"Q. Then you would say that five and possibly six of the daughters have married in plural relationship? A. Well according to my knowledge they could have done.

"Q. Or are living that way? A. Yes.

"Q. Now that principle was taught in the home, in your home, while you were a young lady? A. Well, I don't know what you mean exactly, *if anyone lives the situation, why they naturally get it in their lives.*

"Q. It had the sanction of your parents, didn't it, your father and mother? A. I presume it did.

"Q. And were you opposed when you proposed to become a plural wife of Mr. Black, were you opposed by them? A. I guess I had *my free choice.*

"Q. You sought their counsel I am sure didn't you? A. Well they never stopped me.

"Q. They rather encouraged it did they not? A. They didn't have too much to say about it, they gave their children their free agency.

"Q. Did they ever discuss with you the matter of it being in violation of the laws of the State of Utah? A. Well, I think that anybody that was as old as I was when I was married if I didn't have sense enough to know that why there was something wrong with me.

"Q. But you had heard it discussed? A. Sure.

"Q. It was discussed in the home? A. Well that is what I mean, I was along enough in years that I had knowledge enough to think for myself, I had my own head.

"Q. Do you feel like it was a serious departure to make from the laws of the State of Utah for you to enter into this relationship? A. Well I feel like I took it upon myself. *I feel like the laws of God are higher than the laws of man.*

"Q. Do you adhere to that belief to the extent that you would continue to violate the laws of the State of Utah. A. If you believed that something in your life either amounted to life or death, which would you take.

"Q. I am not on the witness stand, I am just asking you those questions. What would be your attitude on that point now, if it meant that you were to lose your children if you continue that way, would that influence you? A. *Well they say that the children need the influences* of their parents, *that*

*their parents should have the first right to them.*

"Q. Do you think then that it would be proper therefore for you in exercising this influence to teach these children to break the laws of the State of Utah. A. I certainly don't want them to break any laws that are *reasonable.*

"Q. Well now who is to be judge as to which laws are reasonable? Are you going to set yourself up to do that? A. I am not but as the children get of age they have a right to choose for themselves.

"Q. Well, what are you going to encourage them to do with respect to plural marriage? A. Well I don't know that I would do very much to encourage them in anything. I'll probably do the best I can and let them have their choice when they get old enough.

"Q. Is that the way your parents reared you? A. That is.

"Q. And that is the type of influence that resulted in five out of the eight and possibly six marrying in plural marriage in violation of the law, is that right? A. I wouldn't make such a statement.

"Q. Isn't that true? A. *I think it is something to be proud of.*

"Q. And you expect to continue that way? A. Well I don't know how I can continue without a man, as long as the law takes someone away from you how can you continue?

"Q. Then do you not consider the matter of plural marriage or unlawful cohabitation to be in violation of the law? A. *I wouldn't say that to be in violation of the law.*

"Q. What is *your present attitude Mrs. Black* with respect to the plural marriage relationship. A. It has *been my belief all my life that it is the thing that we should live up to.*

"Q. Do you feel like you would be willing to continue to violate the laws of the State of Utah by living as man and wife with Mr. Black in the future? A. It would be pretty hard thing to do to give anybody up after you have lived with him as long as I have.

"Q. You would continue? A. I couldn't live without him.

"Q. Do you feel that they (children) can violate any of the major laws of the State of Utah and live an upright life? Do you feel that they could violate the laws against unlawful cohabitation and plural marriage and still live an upright life? A. According to my knowledge, I think it is an upright life.

"Q. As far as your position is concerned that would still be upright if they did those things? A. Well *according to all the writers * * ***

"Q. * * * don't you feel that the conditions and the situation that has existed there in recent years, prior to July 1953, *would in and of itself*

*tend to* encourage and lead the children to go into a plural marriage relationship? A. *I would say yes,* according to my knowledge.

"Q. And if one of your children came to you and told you that he believed it was his religious duty to enter into a plural marriage relationship, *even though it were contrary to the laws of Utah, would you tell the child that it was entirely* up to him, and you wouldn't encourage him not to do that? A. Yes, I would tell him it was up to him." (Italics ours.)

Mrs. Black answered the judge that she would not be *willing to promise the court* in order to get her children back if the court took them away or to sign a statement that she and Mr. Black would refrain from polygamous cohabitation after the suspended sentence was up—she said "I don't feel to make any promises, if that is what it means, I can't fully promise that I would never live with him again."

Orson Johnson Black, oldest child of appellants testified that he would be 18, April 2, 1954; that he was aware of the fact that his father, was living as husband of three women; he gave the following answers to questions asked:

"Q. Do you feel like that would deter or prevent you from entering into that relationship if you decided to, the fact that it is against the law of the land or wouldn't it? A. No.

"Q. You think it would not? A. No.

"Q. In other words you feel that if you decided to enter into that relationship you would be justified in doing so whether it is in violation of the law or not? A. Yes sir.

"Q. What is your attitude with respect to obedience to law Orson? Do you have any ideas on that subject? A. I believe in respecting all the laws.

"Q. Well that's a law, do you believe in respecting that law or not? A. Well it depends on whether the law of God is higher than the law of the land."

Lillian, twelve year old daughter of appellants answered the court's questions:

"Q. Do you understand that it is a crime for a man to commit a burglary? A. Yes sir.

"Q. Do you think it is wrong for a man to commit a burglary? A. Yes.

"Q. Do you think it is wrong for a man to commit any crime? A. Yes.

"Q. Did you know Lillian that it is a crime for a man to have more than one wife? A. I don't understand why it is."

We have set out the testimony at some length because we deem it advisable that the attitude and thinking of appellants be disclosed. Further this case involves all the children of a polygamous family ranging in ages, at the time of hearing from 17

to 2 years. It is likewise, we believe, the first case to come before this court where the children were held to be neglected as a result of the polygamous relationship and teachings of their parents.

We are unable to escape the firm conviction and conclusion that the evidence amply supports the findings, conclusion and judgment. We cannot reconcile the evidence in this case with any conclusion other than that these children are neglected children within the meaning of Section 55–10–6.

The best interest of the children and the justification for the order depriving the parents of custody and awarding the custody to the Utah State Department of Public Welfare does not necessarily follow a finding and conclusion that the children are *"neglected."*

However as observed in this opinion counsel for appellants have contended throughout the hearing before the juvenile court that the finding of dependency and the decree cannot be supported because in doing so the constitutional rights of appellants have been violated in two respects.

First that Section 55–10–6, U.C.A.1953, is unconstitutional in that it is vague and uncertain.

Second that the constitutional guarantees of freedom of religion and freedom of speech have been violated. There is no merit to the first complaint.

Counsel relies on the 1st and 14th Amendments to the Constitution of the United States and Sections 1, 4 and 15 of Article I of the Constitution of Utah.

The First Amendment to the Federal Constitution reads:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech; or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

It may be observed that the First Amendment to the Constitution of the United States has no bearing on the case before us since it is an interdiction to Congress only.

Section 1 of the Fourteenth Amendment to the Constitution of the United States reads in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The applicable provisions of Sections 1, 4 and 15 of art. 1 of the Constitution of Utah are as follows:

Section 1:

"All men have the inherent and inalienable right to enjoy and defend their lives and liberties; * * * to worship according to the dictates of

their consciences; * * * to communicate freely their thoughts and opinions, being responsible for the abuse of that right."

Section 4:

"The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief on the absence thereof. * * *"

Section 15:

"No law shall be passed to abridge or restrain the freedom of speech or of the press. * * *"

Counsel urgently insists that these constitutional guarantees constitute full warrant for the teachings and acts of appellants complained of. It is contended that they cannot be punished by having their children taken away from them because of their religious convictions or their advocating and teaching the same.

The parents of these children declare that it is their belief that the principle of celestial or plural marriage is a law of heaven, which has been restored never to be taken away, and that it will not be possible for them to realize the fullest blessings unless they believe, teach, advocate and practice plural marriage. That the juvenile court in holding that their children were rendered neglected by reason of the immoral environment by which they surrounded their children and by reason of having encouraged these children to believe in the practice of plural marriage ignored the constitutional rights of these parents and attempted to force them to desist from their beliefs. Counsel for the parents assert that the decree of the juvenile court deprives them of their right to teach their children the religious beliefs to which they adhere.

In support of their position counsel set out substantially the beliefs which the parents have accepted as follows:

"The Lord restored the principle of celestial or plural marriage in line with his promise that in this the last dispensation there would be a restoration of all things and that there should be no taking away again. Plural marriage is one of the laws of heaven that has been restored never again to be taken from the earth or given to another people. It is a law that cannot be abrogated, modified or postponed."

Counsel for appellants assert that what the decree and judgement of the juvenile court does, in effect, is to say that these things may not be taught by these parents to these children.

Reference to the evidence will disclose that there is here not alone the belief, teachings and contention of the parents that plural or celestial marriage is God's law, that is here to stay. We also have the

exercise of the practice of polygamy in the presence of these children.

Probably if the law of plural or celestial marriage had been accepted. and affirmed as a matter of belief only, and not practiced the father of these children would have devoted his attention to his legal wife and her 11 children and Vera Johnson would have probably been lawful spouse to another man and we would have had two complete families.

· If the advocates of this particular religion had believed, taught and contended that plural marriage is a law of God and had postponed, till they leave this sphere, its practice they would probably not be subject to a proceeding such as this.

But say counsel for appellants Section 4 of Article I of the Utah Constitution and the First Amendment to the Constitution of the United States guarantee more than mere belief—those provisions guarantee that the *free exercise thereof* shall not be prohibited and that no law can take away the right to the free exercise of their religious beliefs, and that the practice of polygamy is the exercise of their religious belief.

The argument might seem more potent had it not been answered by the highest court in our land. The same contention was made in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244.

In that case appellant was convicted under an act of Congress prohibiting big-amy in the territory of Utah and appealed.

· It was the contention of defendant that the act of Congress and his sentence were in violation of the First Amendment of the Constitution of the United States. That he married a second time while having a living wife from whom he was not divorced because he believed it to be his religious duty. The defendant proved that at the time of his alleged second marriage he was and for many years had been a member of a church which had as one of its accepted doctrines that it was the duty of male members of such church, circumstances permitting, to practice polygamy; that this duty was enjoined by different books which the members of said church believed to be of divine origin and among others the Holy Bible; he further offered proof that the members of the church believed that the practice of polygamy was directly enjoined upon the male members thereof by the Almighty God, by revelation to the founder of said church; that failing or refusing to practice polygamy by such male members of said church, when circumstances would admit would be punished and that the penalty for such failure and refusal would be damnation in the life to come. He also proved that he had received permission from the recognized authorities in said church to enter into polygamous marriage and that the defendant was married by one having authority in said church to perform the marriage ceremony.

Upon this proof Reynolds asked the court to instruct the jury that it they found

336

from the evidence that he, "was married as charged—if he was married—in pursuance of and in conformity with what he believed at the time to be a religious duty, that the verdict must be not guilty." This request was refused and the court did charge "That there must have been a criminal intent, but that if the defendant, under the influence of a religious belief that it was right,—under an inspiration, if you please, that it was right,—deliberately married a second time, having a first wife living, the want of consciousness of evil intent—the want of understanding on his part that he was committing a crime— did not excuse him; but the law inexorably in such case implies the criminal intent."

The Court stated that the question presented was whether religious belief can be accepted as a justification of an *overt act* made criminal by the law of the land and if one could be found guilty if he knowingly violates *a law if he entertains a religious belief that the law is wrong.*

The Court observed that Congress cannot pass a law which *prohibits the free exercise of religion.* After reviewing the history which led to the adoption of the First Amendment to the Constitution and the meaning of the word "religion" as understood at the time the Constitution was adopted the court quoted the following language from a bill drafted by Thomas Jefferson and adopted in Virginia:

"That to suffer the civil magistrate to intrude his powers into the field of opinion and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty." It was further declared, "that it is time enough for the rightful purposes of civil government for its officers to *interfere when principles break out into overt acts against peace and good order."* (Italics ours.)

The Court calls attention to a letter written by Thomas Jefferson, after the adoption of the First Amendment, wherein he said:

"Believing with you that religion is a matter which lies solely between man and his God; that he owes account to none other for his faith on his worship; *that the legislative powers of the government reach actions only, and not opinions*—I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion or prohibiting the free exercise thereof,' thus building a wall of separation between church and state. Adhering to this expression of the supreme will of the nation in behalf of the right of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, *convinced he has no natural right in opposition to his social duties."* (Italics ours.)

The Supreme Court, following the quoted language observes:

"Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order."

The court in the course of its opinion said "Polygamy has always been odious among the northern and western nations of Europe * * *. At common law, the second marriage was always void (2 Kent, Com. 79), and from the earliest history of England polygamy has been treated as an offence against society. * * *"

"By the statute of 1 James 1. (c.11), the offence, if committed in England or Wales, was made punishable in the civil courts and the penalty was death." The court observes that the Legislature of Virginia in 1788 enacted the Statute of James 1, death penalty included.

Continuing the court said:

"From that day to this we think it may safely be said there never has been a time in any State of the Union when polygamy has not been an offence against society, cognizable by the civil courts and punishable with more or less severity. In the face of all this evidence, it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life. *Marriage,* while from its very nature

a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal. * * *" (Italics ours.)

"In our opinion, the statute immediately under consideration is within the legislative power of Congress. * * * This being so, the only question which remains *is, whether those who make polygamy a part of their religion are excepted from the operation of the statute.* If they are, then those who do not make polygamy a part of their religious belief may be found guilty and punished while those who do must be acquitted and go free. This would be introducing a new element into criminal law. *Laws are made for the government of actions,* and while they *cannot interfere with mere religious beliefs* and opinions, *they may with practices.* * * *"

"A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does. Here the accused knew he had been once married, and that his first wife was living. He also knew that his second marriage was forbidden by law. And the

breaking of the law, is a crime · * * *. Ignorance of a fact may sometimes be taken as evidence of want of criminal intent, but not ignorance of the law. *The only defense of the* accused in this case is his belief that the law ought not have been enacted. It matters not that his belief was a part of his professed religion. It was still belief, and belief only.

"* * * But when the offence consists of a positive act which is knowingly done, it would be dangerous to hold that the offender might escape punishment because he religiously believed the law which he had broken ought never to have been made. No case, we believe, can be found that has gone so far." (Italics ours.)

In the case of Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 502, 33 L.Ed. 637 the defendant was indicted and convicted with others for consiracy to violate a law of the territory of Idaho which provided:

"'No person under guardianship, * * * or insane, nor any person convicted of treason, felony, or bribery in this territory or in any other state or territory in the Union, unless restored to civil rights; nor any person who is a *bigamist or polygamist,* or who *teaches, advises, counsels,* or *encourages* any person or persons to become bigamists or polygamists, or to commit any other crime defined by law, or to enter into what is know as plural or celestial marriage, or who is a member of any order, organization, or association which teaches, advises, counsels, or encourages its members or devotees, or any other persons, to commit the crime of bigamy or polygamy, or any other · crime defined by law, either as a rite or ceremony of such order, organization, or association, or otherwise, is permitted to vote at any election, or to hold any position or office of honor, trust, or profit within this territory.'" (Italics ours.)

The act further required that every person desiring to have his name registered as a voter *to take an oath that he does not belong to an order* that advises a disregard of the criminal law of the territory.

On appeal to the Supreme Court of the United States the Court said:

"* * * Bigamy and polygamy are crimes by the laws of all civilized and Christian countries. They are crimes by the laws of the United States, and they are crimes by the laws of Idaho. They tend to destroy the purity of the marriage relation, to disturb the peace of families, to degrade woman, and to debase man. Few crimes are more pernicious to the best interests of society, and receive more general or more deserved punishment. To extend exemption from punishment for such crimes would be to shock the moral judgment of the community. To call their advocacy a tenet of re-

ligion is to offend the *common sense of mankind.* If they are crimes, then to *teach, advise, and counsel their practice is to aid in their commission, and such teaching and counseling are themselves criminal, and proper subjects of punishment, as aiding and abetting crime are in all other cases.* The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will. *It is often confounded* with the *cultus or form of worship* of a particular sect, *but is distinguishable from the latter.* The first amendment to the constitution, in declaring that congress shall make no law respecting the establishment of religion or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his *relations to his Maker and the duties they impose as may be approved by* his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect. The oppressive measures adopted, and the cruelties and punishments inflicted, by the governments of Europe for many ages, to compel parties to conform, in their religious beliefs and modes of worship, to the views of the most numerous sect, and the folly of attempting in that way to control the mental operations of persons, and enforce an outward conformity to a prescribed standard, led to the adoption of the amendment in question. It was never intended or supposed that the amendment could be invoked as a *protection against legislation for the punishment of acts inimical to the peace, good order, and morals of society.* With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with. However free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed *with reference to actions regarded by general consent as properly the subjects of punitive legislation.* There have been sects which denied as a part of their religious tenets that there should be any marriage tie, and advocated promiscuous intercourse of the sexes, as prompted by the passions of its members. And history discloses the fact that the necessity of human sacrifices, on special occasions, has been a tenet of many sects. Should a sect of either of these kinds ever find its way into

this country, swift punishment would follow the carrying into effect of its doctrines, and no heed would be given to the pretense that, as religious beliefs, their supporters could be protected in their exercise by the constitution of the United States. Probably never before in the history of this country *has it been seriously contended that the whole punitive power of the government for acts, recognized by the general consent of the Christian world in modern times as proper matters for prohibitory legislation,* must be suspended in order that the tenets of a religious sect encouraging crime may be carried out without hindrance." (Emphasis ours.)

The Supreme Court of the United States has answered appellants' objection that the judgment of the Juvenile Court violates their constitutional right to worship as they see fit and to speak freely.

So too has this Court answered appellants' objection in the same way. It had before it a charge of unlawful cohabitation in the case of State v. Barlow, 107 Utah 292, 153 P.2d 647. Speaking for this Court, Mr. Chief Justice McDonough at page 304 of 107 Utah, at page 652 of 153 P.2d said:

"If an act of Congress would be violative of the First Amendment the same legislation by a state would be in violation of the Fourteenth. The decisions of the United States Supreme Court as to whether a congressional act similar to that here considered contravenes the First Amendment are therefore authoritative."

It therefore follows that we have left to consider the claim of appellants that the judgment violates the constitutional guarantees contained in the Utah Constitution and set out earlier.

In answer to appellants it is only necessary to observe that the Constitution of Utah contains Article 3 (the Irrevocable Ordinance) which reads:

"[Religious toleration—Polygamy forbidden.]

"First:—Perfect toleration of religious sentiment is guaranteed. No inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship; but polygamous or plural marriages are forever prohibited."

In addition to the reasoning contained in the cases decided by the United States Supreme Court, the Constitution of Utah cannot be construed so that the Third Article is voided by the provision of Sections 1, 4 and 15 of Article I.

Article III of our Constitution is a complete answer to appellants' contention. The specific prohibition against polygamous or plural marriage therein contained may not be impliedly annulled by any interpretation of Sections 1, 4 and 15 of Article I inconsistent therewith. The prohibition following as it does the guarantee of religious toleration prevents any conclusion that the

framers of our Constitution did not intend to put a specified limitation on the language contained in Section 4, Article I of the State Constitution.

The prohibition against polygamous or plural marriages following the guarantee of religious tolerance is double emphasis that the framers of our Constitution wished to make clear that polygamy was not included within an approved mode of religious worship.

Attention is likewise called to the following language used in State v. Barlow, supra, in which the defendant's contention was the same as that here. Speaking for the Court at page 307 of 107 Utah, at page 654 of 153 P.2d Mr. Chief Justice McDonough said: ·

"But assuming that the people of the state could, on the ground of coercion, avoid the 'irrevocable ordinance' only; that is the business of the people of the state and not of a faction or sect among them. And no attempt has been made to repeal the Constitutional provision forever prohibiting polygamy. * * *"

The third question which we must answer is this: Was the judgment of the Court depriving the parents Leonard Black and Vera Johnson of the right of custody and control over said children, and awarding the custody to the Utah State Department of Public Welfare, justified under the facts in this case?

As heretofore observed, it does not necessarily follow from a finding that children are *neglected* that an order must be made depriving the parents of custody.

As was observed by this Court in Mill v. Brown, supra [31 Utah 473, 88 P. 613],— "Such laws are most salutory * * * calculated to save the child from becoming a criminal * * * *only object* * * * *is to provide the child with an environment such as will save him to the state and society as a useful and law-abiding citizen, and to give him* the educational requirements necessary to attain that end." (Emphasis ours.)

Section 55-10-30, U.C.A.1953, provides that if the judge finds the juvenile to be delinquent, dependent, or neglected, he shall enter in writing the facts constituting such delinquency, dependency, neglect or other offense and may adjudge and decree as follows:

"(1) That the child be placed on probation or under supervision in his own home, or in the custody of a relative or other fit person, upon such terms as the court shall determine;

"(2) That the child be committed to the state industrial school or to any suitable institution, children's aid society or other agency incorporated under the laws of this state and authorized to care for children or to place them in family homes, or to any such institution or agency provided by the state or a county;

"(3) That the child be required to make restitution for damage or loss caused by his wrongful acts;

"(4) That the child be placed under such guardianship or custody as may be warranted by the evidence and for the best interest of the child; provided, however, that in the selection of a guardian the court shall give due consideration to the preference of parents;

"(5) That the child be disposed of in any other way, except to commit it to jail or prison, that may, in the discretion and judgment of the court, under all circumstances be for the best interest of the child, to the end that its wayward tendencies shall be corrected and the child be saved to useful citizenship."

In State in Interest of Bennett, 77 Utah 247, 254, 293 P. 963, 966,—this Court said:

"It has always been the policy of both the Legislature and the courts of the various states not to deprive or interfere with the important and sacred relation of parent and child unless absolutely necessary *for the welfare of the child* or *for the protection of society.* * * * When it is made to appear that a parent or parents of a child know *that said child is committing acts of delinquency and that they are unable to control such child and prevent him from further wrongdoing, the interest of the child as well as the protection of society may well demand that the* par-

ents surrender their custody of their child to the state so that, if possible, *the child's evil tendency may be corrected and society protected."* (Italics ours.)

After having found the children neglected under Section 55–10–30 the Juvenile Court is required to place them under such custody as shall be for their best interest.

If the court determines that the children should be placed under guardianship or custody, the court, in selecting a guardian, must give due consideration to the preference of parents. That Section also empowers the court to place the children on probation or under supervision in their own home upon such terms as the court shall determine. We will refer to this provision later herein.

Counsel for appellants contend that having found the children neglected, still, under the provisions of Section 55–10–32, the parents were entitled to have the children placed in their custody. Speaking for this Court in a recent case, Mr. Justice Wade observes:

"We call attention to the fact that cases involving the custody of a child are cases in equity and this court is required to determine the facts as well as the law. * * * We must therefore examine the record and independently determine the facts therefrom, keeping in mind that the trial judge who heard and saw the witnesses was in a better

position than we are to weigh and evaluate their evidence."[4]

Section 55–10–26 requires the court to inquire into the home *environment, history, associations* and *general condition* of such children.

Section 55–10–32 upon which appellants rely in contending that the judgment is void contains these provisions:

"No child * * * shall be taken from the custody of its parents * * * without the consent of such parents * * * unless the court shall find from the evidence introduced in the case that such parent * * * *is incompetent, or has knowingly failed* and neglected to provide for such child the *proper maintenance, care, training and education* contemplated and required by *both law and morals,* * * * or unless the court shall find from all the circumstances in the case *that public welfare or the welfare of a child* requires that his custody be taken from its parents * * *."* (Emphasis ours.)

This Court has held that there is a presumption that it will be for the best interest and welfare of the child to be reared under the custody and control of its natural parent. However, this presumption is one of fact and not of law, and may be overcome by any competent evidence which is sufficient to satisfy a reasonable mind thereon.[5]

The provisions of Section 55–10–32, above set out, also contain a positive mandate independent of the last four lines in that Section.

The court found that the home of the parents is an immoral environment for the rearing of the children. It further found that the parents have each *knowingly* failed and neglected to provide for said children the proper maintenance, care, *training and education* required by law and morals.

The Section under consideration does not mandate the court to leave the custody with the parents when the court finds from the evidence introduced that the parents have knowingly failed and neglected to provide the proper maintenance, education and training required by *law* and *morals.*

Let us advert to the evidence in this case to determine what if any right to retain custody of their children is shown therein. We are not here dealing with the situation that would confront us if Leonard Black and Vera Johnson were charged with a criminal offense in teaching their children the doctrine of polygamy, nor are we required to apply the rules applicable were they charged with conspiracy to violate the law prohibiting unlawful cohabitation as was Mr. Black in the Arizona case. Here we ask the question: Did appellants, Leonard Black and Vera Johnson, contribute to or cause their children to become neglected by what they did and what they failed to do, and does the

4. In re Bradley, 109 Utah 538, 167 P.2d 978, 984.

5. Walton v. Koffman, 110 Utah 1, 169 P.2d 97.

welfare of these children or the public welfare require that their custody be taken from the parents? Nor is an affirmative answer to that question dependent on the fact that the parents are guilty of a criminal offense or of criminal offenses in so doing.

Let it be conceded that the advocacy of a belief in the practice of polygamy or unlawful cohabitation without overt action is protected by the right of free speech and the right to believe and teach such religious doctrines as one sees fit so long as it does not incite to crime; still it does not follow that teaching, preaching and advocating the practice of plural marriage and urging their children to teach, preach and advocate the practice would not come within the specific prohibition of Section 55–10–6, supra, defining a neglected child as one whose parent neglects or refuses to provide the care necessary for his health, morals or well-being.

Certainly it was unnecessary to spell out, as is done in that Section, what makes a child neglected if, as appellants urge in their briefs and in argument before the Juvenile Court and here, that unless the parents have committed a crime in teaching, advocating and urging the doctrine of plural marriage to their children the Juvenile Court is without authority to determine that the children are neglected or that the parents have forfeited their right to custody.

At this point, however, we might well pause and inquire if these parents are free from criminal conduct. There can be no question that Leonard Black embarked upon a criminal career when he began his meretricious relations with Vera Johnson; not only that, but he later established the same illegal relations with Lorna Johnson, Vera's younger sister. Both Mr. Black and Vera Johnson ignored the laws of this state enacted for the social order and public welfare.

Section 30–1–2, U.C.A.1953, provides:

"The following marriages are prohibited and declared void: * * *

"(2) When there is a husband or wife living from whom the person marrying has not been divorced."

When Mr. Black went through the illegal ceremony of marrying Vera Johnson he knew that he had a wife living from whom he had not been divorced. Vera Johnson knew that the purported marriage was in violation of law (even if she did not know Mr. Black was married) because no license was obtained from the County Clerk as required by our statute, Section 30–1–7, U.C.A. 1953 which provides:

"No marriage shall be solemnized without a license therefor issued by the county clerk of any county in the state of Utah."

Both Leonard Black and Vera Johnson knew that John Y. Barlow, who performed the pretended ceremony, had no right to perform it without a license and, in doing so, committed a criminal offense.

Section 30–1–6, U.C.A.1953 declares:

"Marriages shall be solemnized by the following persons only:

"(1) Ministers of the gospel or priests of any denomination in regular communion with any religious society;

"(2) Justices of the peace, mayors of cities, judges of a city court, of a district court and of the Supreme Court."

Mr. Black, asked if he knew whether or not John Y. Barlow at the time the marriage was performed was a minister of the gospel or a person duly authorized to perform marriage ceremonies under the law, answered: "I don't know as to that." The appellants knew that if John Y. Barlow was not authorized to solemnize marriages, that he by pretending to have authority committed a felony and could be committed in the state prison for three years.[6]

Why should law-abiding, upright citizens of this state put great store in their wedding anniversaries, carefully preserve their marriage certificates and see that the birth certificates of their children are properly recorded showing that the marriage was legal, that their cohabitation is lawful and that their children are legitimate, when it is claimed by appellants to be okay to do as they did these many years and without the expense otherwise entailed.

But the statutory requirements above mentioned constituted no legal or other barrier to appellants. They had, and for 20 years have had, a method convenient, easy, illegal and immoral; for two decades they have lived above the law and, so far as this record discloses, without prosecution of any kind except the charge against Leonard Black by the Arizona authorities immediately following the raid of July 24, 1953. They, after such ceremony as was used, if any, without license or benefit of clergy, and without calling on a civil officer authorized to perform the ceremony, proceeded to "multiply and replenish the earth." Marriage licenses were not for them; legal ceremonies were passe; they ignored every law established for the orderly behavior of decent people. Why should it be assumed that Leonard Black and Vera Johnson are the proper persons to have the custody and control of these children? Is it possible that the best interest of the children will be secured? Is it likely that these children will be saved to useful citizenship by being left with the appellants?

We cannot ignore the statement of a wise man, who said: "Train up a child in the way he should go and when he is old he will not depart therefrom." If public welfare and the best interest of these children will be served by training them in the way of immorality and crime, then the judgment of the Juvenile Court is wrong.

If we set aside the judgment of the Juvenile Court and permit this condition to continue, we will probably have the same arguments, and the same excuses when these children are brought before the court to determine their right to custody of their children, resulting from the continuation of this

6.  Section 30–1–14 U.C.A.1953.

system. The great tragedy of it all is that this proceeding was not commenced eighteen years ago when the first child of this polygamous relationship was born. Had that been done, we might not now be concerned with the other seven born to Vera and the seven born to her younger sister, Lorna, since that time from this immoral and illegal relationship. Nor are we required to make a harder choice. If we now ignore our duty to the state, to society, to decent citizenship and to these children and to others who will undoubtedly be born to these appellants, if no bars are put in place, the task will be still more difficult for our successors to cope with.

It is true that taking these children from their parents does seem harsh, and visits the sins of this father upon these children. That is quite true but unless we are genuinely concerned for the welfare of these children and for the public welfare and apply the harsh treatment required and stop the spread of this immoral and illegal practice the sins of this father will be visited upon the children of these children to the third and fourth generations.

Under the first part of Section 55–10–32 these parents have forfeited the right to have the children left with them. They have not only *"failed and neglected to provide [the children] with proper maintenance, care, training and education * * required by both law and morals,"* but have affirmatively and knowingly provided the children with the care, training and education violative of law and morals.

They have not only failed to teach their children that polygamy and unlawful cohabitation are against the law and morals, but they have positively taught their children that the law of plural marriage and the practice of plural marriage was right and they have encouraged their children to teach, preach and practice it. Further these appellants have actually practiced plural marriage and have unlawfully cohabitated in the presence of these children. They have gone further than to advocate the correctness of plural marriage they have provided the horrible example to these children and have subjected the children to living with the system. Not alone that, but these children have been reared in a plural marriage environment where it was considered highly proper by the best people of the community; the system not only had the approval of the best people but of the big majority. They saw their father go from one family to another and from one wife to another. The oldest daughter surprised no one when she testified that she didn't understand why it was a crime for a man to have more than one wife.

How can these children be expected to do other than follow the training they have received. They have been trained for the same immoral life their parents are living.

Further potent argument that this result will follow is the statement of appellants' counsel at the opening of the case. After

admitting that prior to July 24, 1953 *the parents encouraged the children to believe in the practice of plural marriage,* he said:

"We offer to admit that Mr. Black and his families were of *a plural marriage origin,* Mr. Black's grandfather being in the order of plural marriage and the families of Vera and Lorna and Verna likewise * * *." (Emphasis ours.)

Counsel seeks to excuse and justify Leonard Black and Vera Johnson as well as Mr. Black's two other wives because the system is in their blood—because they have inherited it. However, it may be observed that many fine citizens of this state could excuse such a polygamous life on the same ground Mr. Black uses—that they are of plural marriage origin, and that their grandfathers were in the order of plural marriage. So what? We are asked to say that because it is in the blood of the parents of these children now before the court, it should be excused and we are asked to hold that the statutes and constitution of this state are impotent to protect these children and the state against this practice. We ask how long it will be with the urge and capacity of Leonard Black and others operating as he does, unless there is a curtailment of such activities, until those who have it "in the blood" will have contributed a share of this state's population (two score and ten years from now) out of all proportion to the normal population increase. Mr. Black already, at the age of 48, has furnished 26 children, five of whom are living in plural marriage relations. Mrs. Black's parents furnished fifteen children and at least five of her sisters are living in the polygamous relationship.

How much more inexcusable for these parents to hide behind this religious cover while subjecting their children to what must be reasonably anticipated as an entrapment into this system. Nor is it necessary that the state, as contended for by appellants, stand by and await results. Counsel urge that since it is not certain that these children will follow in the footsteps of the parents that we are not justified in taking the children from them until that happens. But when they enter upon the pattern set for them it will be too late for the protective arm of the state to help.

Why should the legislature under heavy public demand provide a court to care for neglected children and safeguard their care to the end of assuring the best interest of the children and the welfare of the state and then permit emotion to undermine what was intended to be accomplished?

Section 55–10–32 contains the further exception to the rule that the Juvenile Court shall not take the custody of a child from its parents. That mandate ceases to exist if the court shall find from all the circumstances in the case that *public welfare* requires that his custody be taken from its parents.

The court's findings in this case would seem to be a positive answer that what these parents have done is inimical to the public

welfare. A review of what has heretofore been observed establishes that the conduct of these parents over the past 20 years has been very much against the public welfare. Is it not quite likely that the example of this group living unmolested in open violation of the laws established to assure proper conduct on the part of our citizens will afford excuse, justification and precedent for other segments of our society to do likewise.

The good name of this State and its people, committed to sustaining a high moral standard, must not be obliged to suffer because of the unsavory social life of appellants and others claiming the constitutional right under the guise of religious freedom to bring shame and embarrassment to the people of this state. It is against the public welfare to permit such conduct as appellants indulge in to justify the people of this great nation in referring to us as a people high in religious adherence but low in morals and law observance.

In our opinion public welfare demands that the state take all proper steps available to protect itself against the social life advocated by appellants. The state cannot afford to gamble with the welfare of these children by permitting them to remain with appellants and live in an environment of immorality.

But notwithstanding the evidence amply establishes and the court correctly found, that these parents have knowingly failed to provide the children with the proper maintenance and care contemplated and required by both law and morals, still this alone does not mandate the court to deprive the parents of the custody of their children. It only opens the door so that the Juvenile Court is free to place the children under such custody as shall be for their best interest. Mr. Justice Wade, speaking for this court in In re Bradley, supra, said:

"The court might well conclude that it would be for the best interest of the child to place it in the custody of the natural parent even though at some time such parent had failed to provide it with the necessary maintenance and care. Thus our problem is to determine what is for the best interest of this child."

What is the effect of the evidence? Is it such as to persuade the court that it is for the best interest of these children that the parents be deprived of their custody.

We are of the opinion that the evidence in this case warrants the conclusion that these children must for their own best interest be taken from the custody of their parents. The evidence warrants fully the court's findings that the home of the parents is an immoral environment. Here they are subjected to this illegal and immoral practice in action. They are taught that it is God's law and that it is above the law of man.

Reference to the testimony of Leonard Black and Vera Johnson set out herein discloses that these children in addition to being in an immoral environment are positively instructed and urged to accept the social life of the parents as superior to and

above the commonplace, dull life lived by the monogamists of this state.

By their own confession these parents have taught, preached and practiced the law of plural marriage in the presence of these children. They are proud of the life they live. They have no intention of changing. They failed to perform their parental duties toward their children. They admitted that they had not advised their children that polygamous marriages constitute a criminal offense. Leonard Black, as heretofore pointed out, took no action when he knew that five of his daughters were entering into the plural marriage relationship. So far as those girls were concerned they could have been no worse off had they been without a father. They could not have received less fatherly advice.

The record fully justifies the conclusion that this failure to urge the children to avoid the order came from either a desire that they enter it or a willingness that they do so.

Is that the kind of parental training that the state expects of its citizens?

So, too, this mother gave significant testimony. She testified that if anyone lives around the situation, "why they naturally get it in their lives."

Asked if she felt that her children could violate the laws against unlawful cohabitation and plural marriage and still live an upright life, she answered:

"According to my knowledge, I think it is an upright life."

Mrs. Black stated that *if her children were taken away that she would be unwilling to promise that she and Mr. Black would refrain from polygamous cohabitation in order to get her children back.* The evidence further shows that these parents had successfully indoctrinated their children or had failed to prevent them becoming indoctrinated into the system.

Can it be assumed that the best interest of these children will be furthered by leaving them in the custody of the appellants?

We believe not. We therefore are of the opinion that the judgment of the Juvenile Court depriving Leonard Black and Vera Johnson of the right of custody and control over said children and making the children wards of the Juvenile Court must be sustained. In our opinion the record in this case warrants no other conclusion. Both public welfare and the welfare of the children justify the judgment.

The fourth question which we must answer is this: Was the decree and judgment unconstitutional and void as imposing the requirements specified in subparagraphs (a) through (f) of paragraph 3 thereof? We have heretofore set out the provisions of Section 55–10–30 which directs the disposition to be made by the Juvenile Court of a child adjudged neglected. The court may decree as follows:

"(1) That the child be placed on probation or under supervision in his own home * * *

"(4) That the child be placed under such guardianship or custody as may be warranted by the evidence and *for the best interest* of the child; provided, however, that in the selection of a guardian, the court shall give due consideration to the preference of parents."

Having found the children neglected the Juvenile Court deprived the parents of the right of custody over the children and made the children wards of the court subject to its continuing jurisdiction.

In keeping with the spirit of the Juvenile Court law and mindful that corrective measures looking to the best interest of the children are called for, the court provided for placing the children on probation or under supervision in their own home as contemplated by Section 55–10–30.

The conditions of that probation are set out earlier in this opinion.

Appellants assail the conditions imposed, contending that said requirements violate their constitutional guarantees of freedom of speech and freedom of religion. Let us examine this contention. Section 55–10–5 (1) U.C.A.1953, provides:

"In any case in which the court shall find a child neglected, dependent or delinquent it may * * * inquire * * * into the fitness of such parents to continue in the custody and control of such child. *The court may enter such order or decree* as shall be according to law and/or equity in the premises, and *may enforce the same in any way* in which a court of law or equity may enforce its orders or decrees."

The conditions contained in the provisions of 3(a) through 3(f) are not a judgment against the children or the parents. The parents were not ordered to take the children. It was only a privilege offered appellants on conditions. The court's judgment awarded the custody and control of the children to the Utah State Department of Public Welfare. After so decreeing, the court conditioned its decree in accordance with Section 55–10–30 and placed the children on probation in their own home; and in accordance with the provisions of Section 55–10–5(1) above set out.

The decree and judgment did not order the parents to keep the children; it sought by what was provided after the awarding of custody to the Welfare Department, to extend grace and clemency to the parents and it permitted the parents to retain the custody subject to the conditions therein specified. The probation was not mandatory; Appellants were free to accept or reject the same. They elected to reject the probation proffered by the court. The court granted appellants an option to accept probation, on the conditions specified, on or before May 25, 1954. On that date, by their refusal to accept the probation, the right thereto expired and ceased to be of any force or effect. But the judgment placing custody with the Welfare Department was fully operative and that decree still stands as the final judgment of the court.

The provisions upon which the children might remain with the appellants were in keeping with the requirements necessary for the public welfare and the welfare of the children. It would be folly to send these children back to the same home environment which required the decree transferring custody to the Welfare Department, without requiring some assurance that the environment would be cleaned up. The parents had forfeited their right to custody of their children. Let it be assumed that the court, instead of providing that the children remain with appellants subject to the conditions named, had provided that the custody of the children would be returned to the parents if the parents, on or before May 25, 1954, would file with the court a sworn statement that they would comply with the conditions set out in subparagraphs 3(a) through 3(e). The appellants, in either situation, are the recipients of the court's favor and in no sense the holders of the right to have their children placed on probation without any conditions attached. There is no merit to appellants' contention.

The court, in placing the children on probation, was entitled to impose conditions most likely to accomplish the results desired. The court in the interest of the children sought assurance that they would be removed from the teachings and practices that might well lead to their following in the footsteps of the parents. The parents had no legal right to demand that the children be placed on probation, nor did they have a legal right to dictate to the Juvenile Court as to the conditions on which probation would be granted.

If the Juvenile Court had, after finding that the custody should be given to the Welfare Department, placed the children in the home with appellants without any conditions and without limitation on the parents it would have constituted a reversal of its order.

Appellants could not accept the probation granted their children and then contend that the conditions upon which granted were unconstitutional and void.

We, however, are of the opinion that the Juvenile Court order in returning the children to Leonard Black and Vera Johnson while the parents continued to live together in unlawful cohabitation failed to safeguard the children's welfare and went further than was proper.

We believe it would be fruitless to ask that these parents counsel their children to obey the law while they are themselves in violation.

The court, in requiring as a condition of the probation that the parents comply with the laws of Utah relating to marriage and sexual offenses should have required that there be no unlawful cohabitation which, under the decision of this court in the case of State v. Barlow, supra, consists of living together as husband and wife and holding a woman out to be a wife.

The Juvenile Court was too lenient on these parents. The court might provide, if it sees fit, that the children be allowed to

remain with the mother Vera Johnson, but on the specific condition that Leonard Black desist from living with her.

It would be highly desirable if these children could have the care of their natural mother, but it would be more desirable that they be brought up as law-abiding citizens in righteous homes. The price is too great to require these children to continue under the same influences that they have been exposed to.

The Juvenile Court has evidenced a genuine desire to permit these children and their mother to enjoy the companionship of parent and child if they will cooperate to make it possible. We are of the opinion that if a new order is made leaving the children in the home, that it be on condition that Leonard Black shall not reside there. We believe that unless the polygamous relationship and the unlawful cohabitation between Leonard Black and Vera Johnson cease, *and completely*, that the Juvenile Court should take the children from the *appellants permanently*.

But if Vera Johnson discontinues living with Leonard Black until he has the legal right to live with her as her husband then she might be granted the temporary custody of the children. That custody, however, should be conditioned on the complete cessation of all polygamous relations and unlawful cohabitation between these parents. If the parents are unwilling to give the court that guarantee and assurance as ordered in the court's decree and as suggested here then the temporary custody should not be left with the mother and in no event with the father or both.

If the Juvenile Court is satisfied that the interest of the children and the public welfare can be safeguarded by permitting these children, or even part of them, to remain with the mother then it might act accordingly.

It is not intended by anything said suggesting that the Juvenile Court might leave the children with the mother as being a retreat from our position that the practice of polygamy and unlawful cohabitation should be weeded out and that children should not be subjected to its evil influence and environment. The practice of polygamy, unlawful cohabitation and adultery are sufficiently reprehensible, without the innocent lives of children being seared by their evil influence. There must be no compromise with evil.

The judgment of the Juvenile Court is affirmed, no costs awarded.

McDONOUGH, C. J., concurs in the result.

WADE, J., does not participate.

CROCKETT, Justice.

I concur in affirming the judgment. The juvenile court was patient to the point of long-suffering in indulging these people every opportunity to indicate a willingness to abide by the law and retain custody of their children. This they obdurately re-

fused to do. They came back into court in open defiance of the law, asserting that the "law of God," concerning which they presume to claim special knowledge, is superior to the law of man. Not having the advantage of any special knowledge of the "law of God" on this matter, I must content myself to judge it upon the basis of my understanding of the laws of our state and nation as established through the processes of democracy. It would be a dangerous principle indeed for some to be bound by the law thus established, whereas others could flout it, using the excuse that the "law of God," which they claim is known specially to them, renders them immune.

In view of defendants' defiance of the juvenile court's entirely reasonable order, he had very little choice, consistent with his sworn duty to uphold the law, than to take the action he did in the interest of these children. It was certainly well within his prerogative, and, this being a proceeding equitable in nature, we should not disturb his judgment unless the evidence clearly preponderates against his findings, or he abused his discretion or misapplied principles of law or equity, none of which are present here.

HENRIOD, Justice.

I concur. In doing so, however I reserve my opinion on all matters touched upon in the main opinion not directly related to the legal aspects of the case. For example, I cannot say, as the main opinion seems to imply, that polygamy is *morally* wrong. It

is neither morally nor legally wrong in Turkey and elsewhere. It is questionable whether it was morally or legally wrong in Utah Territory in the 19th Century, and I like to think, at least, that my great-grandfather was not only a law-abiding citizen, but was not immoral according to the mores of his time. What is moral, or legal, depends in most part upon time, place and circumstance. Today, in Utah, the circumstances which go to make up adultery and polygamy, legislatively are considered and treated as felonies,—both of which offenses have been committed by the father in this case. Our decision, therefore, can be resolved by answering a most simple question: Do the statutes of our state constitutionally permit the Juvenile Court to deprive parents of the custody of their children, if such parents practice and teach their children to practice a felony,—*any* felony? This question must be answered in the affirmative, and there would be little difficulty in answering it if the felony being taught to the children were murder, rape, armed robbery, burglary and the like. Where children and parents and religion are involved, the answer to the question tends to stick in our throats, but we are duty bound to utter it when confronted with it.

Because of the nature of this case and conceding without determining the fact that these particular litigants may be erstwhile honest, God-fearing souls, so devout in their belief in a religion, one of whose tenets offends against our existing laws, I would be inclined to eliminate any reference to

names or specific details, being content to answer the simple question posed above, and approve the power and procedure of the Juvenile Court. I would be content to give the plural wife principle involved in this case a decent, Christian burial, by simply stating the law involved, and while interring it, remember the admonition of Christ that "He who is without sin among you, let him first cast a stone." To go further may invite martydom, which more than once has solved no problem.