326 P.2d 707

**Alma Phyllis HALL, Plaintiff and Respondent,**

**v.**

**Lynn Bateman HALL, Defendant and Appellant.**

**No. 8772.**

Supreme Court of Utah.

June 5, 1958.

Horace C. Beck, H. A. Smith, Wallace B. Kelly, Salt Lake City, for appellant.

George K. Fadel, Bountiful, for respondent.

HENRIOD, Justice.

Appeal from a judgment awarding plaintiff the custody of children and an amount for support money arrearages. Affirmed with costs to plaintiff.

An equity case, we examine and weigh the evidence, and must affirm unless the trial court's conclusion obviously was against the weight of the evidence.[1] We believe a fair review of the evidence which we consider determinative here, reportable as follows:

In July, 1949 the parties married. A daughter was born in February, 1950, a son in March, 1951, and a second daughter in April, 1952 a month after the parties were divorced at Salt Lake City in March, 1952. Plaintiff was awarded custody of the children, with right of visitation in defendant; also $30 per month per child as support money. Thereafter defendant moved to Washington state to work. He did not return to visit the children up to the beginning of 1955, because, he testified, his work would not permit it. Early thereafter plaintiff took the children and left the state of Utah.

It appears that for a time before July, 1954, plaintiff and two friends, Lois, a divorced wife of one Roestenburg, and Shirley M. lived at times either together or in close proximity. It is only fair to report that the evidence indicates that Roestenburg was friendly and visited with all, under circumstances suggesting a possible polygamous or adulterous arrangement.

In July, 1954, after divorcing Lois, Roestenburg married plaintiff. A private detective employed by defendant testified that in October, 1954, he tried to deliver support money for defendant to the plaintiff but could not contact her. He also sought to serve her with process. Since

1. Alldredge v. Alldredge, 1951, 119 Utah 504, 229 P.2d 681, 34 A.L.R.2d 305.

that time defendant has paid nothing to plaintiff, nor to her attorney, the court or her mother on her behalf. It must be conceded that plaintiff kept herself pretty much beyond reach. Defendant spent a considerable sum in trying to locate her and the children, at least partially, it would seem, to serve process on her in an effort to gain custody of the children, allegedly being neglected by plaintiff in an atmosphere of polygamy.

In January, 1955, plaintiff, the children and her then husband Roestenburg traveled to Pocatello, Idaho, remaining a month. Then they all went to Mexico, remaining there until November, 1955, after which they migrated to Albuquerque, N. M., where in 1957, plaintiff finally divorced Roestenburg. It appears that the peripatetics of plaintiff and Roestenburg had little or nothing to do with the ultimate and inevitable appearance on the scene of Shirley and Lois, who would then either live in the same house with plaintiff and Roestenburg, or not far away, implying the existence of a rather unorthodox amiability amongst the four.

In October, 1956, defendant petitioned for modification of the divorce decree, asking for custody of the children on the ground of neglect arising out of the alleged polygamous climate in which the children were being reared. Notice of hearing was published. In due course custody was awarded to defendant on plaintiff's nonappearance.

In May, 1957, plaintiff divorced Roestenburg in Albuquerque. In July, 1957, plaintiff's attorney wrote her mother-in-law and advised as to plaintiff's whereabouts. The former immediately went to Albuquerque, armed with the modified decree, and took possession of the children, delivering them to defendant in Olympia, Washington. In August, 1957, plaintiff petitioned to have the custody restored. At the hearing in September, 1957, the trial court voided the decree awarding custody to defendant on the ground defective notice had been given. It awarded custody to plaintiff, together with a money judgment for accrued support money, from which this appeal was taken.

At the hearing, after plaintiff had said she did not practice polygamy, an objection on grounds of immateriality was sustained to a question put to her as to whether she knew Roestenburg practiced the doctrine. Other questions directed to the private detective employed by defendant concerning instances of alleged meretricious associations and relationships between plaintiff, Roestenburg, Shirley and Lois, occurring three years before in 1954, were ruled out as being remote and immaterial.

Defendant says that 1) it was error to exclude such evidence of Rostenburg's past conduct with plaintiff and the two other

women, and 2) it was error to give the money judgment for support money.

■ As to 1): We believe the court was correct in its exclusion. Counsel had examined plaintiff at considerable length about her life with Roestenburg and with respect to any association he or she may have had with the two women mentioned. We cannot see how, after plaintiff and Roestenburg had been divorced about four months, her knowledge as to what his present belief or conduct with other women would be material as to her own fitness to have custody of the children, nor can we see how the testimony of the detective concerning incidents three years prior thereto could be anything but remote, under the circumstances of this case. There was no evidence other than that plaintiff was the legal wife of Roestenburg from July, 1954 to May, 1957, when they were divorced, and none to the effect that, whether she at one time had embraced polygamy as a religious tenet or not, she either presently or for sometime past espoused or practiced such dogma or attempted the unlikely chore of teaching it to her children, the eldest of which was only seven years old. Contrariwise, her testimony that she did not indulge the doctrine finds support in the fact that in Albuquerque she sent her children to the Sunday School of the Church of God, a church undedicated to the doctrine of plural marriages.

Defendant leans heavily on the case of In re State of Utah in the Interest of Black[2] to support its first point on appeal. Counsel for plaintiff seems to have answered such contention in succinct language in his brief when he stated (deletions ours):

" * * * the Black case is * * * different from the instant case. Vera Johnson * * * was * * * a plural and not a legal wife of Black; both * * * refused to refrain from teaching their children that polygamy was proper; and there is nothing in the Black case which supports the proposition that a lawful wife becomes an unfit parent by reason of the activities of her husband with other women. In the instant case the plaintiff was the lawful wife of Roestenburg; there is no evidence that the children were ever aware of any conduct of Roestenburg with any other women; there was no evidence that the children were ever taught any principles relating to polygamy. The trial court found that after April 15, 1957, the plaintiff did not live as * * * wife with Roestenburg and at no time was the relationship * * * such as to render the plaintiff unfit to retain custody * * *."

■ When and if it could be demonstrated, as it was in the Black case, that

2. 3 Utah 2d 315, 283 P.2d 887.

in their presence and with their knowledge, the plaintiff is found practicing and teaching the doctrine of plural marriage to her children, this court would be obliged to follow the principle in the Black case. In this connection, we think it elementary that the trial court may entertain continuing jurisdiction in cases like this, and in a proper proceeding may canvass any changed conditions, and effect any shift in custody that such changed conditions might warrant, having in mind, of course, the highly respected and not easily divestible rights of either or both of the natural parents.

As to the contention 2): That the court erred in reducing the unpaid support money to judgment, defendant relies on Larsen v. Larsen [3] in support thereof. Plaintiff stated that she did not seek out defendant to require payment because she was trying to enjoy a peaceful life and it was not worth it to her at the time. Here any similarity to the Larsen case disappears. Such statement does not reflect any representation to defendant that he would not be held accountable for the support money, as was the basis for the Larsen decision. In truth, he said he was trying to make payment in October, 1954, but could not locate plaintiff. He intimated that he would have made payments had he been able to locate her thereafter. It would appear that Price v. Price would be controlling here.[4]

Although the record and the authorities cited do not justify this court in reversing the money judgment, it does seem that the defendant's expenditures in attempting to locate the children and the plaintiff in what appears to have been an honest effort to do what he sincerely believed to be for the best interests of his own flesh and blood, whether right or wrong, coupled with plaintiff's peregrinations that appear likely to have amounted to a calculated concealment, should merit a compassionate attitude toward satisfaction of the obligation which this defendant, a wage earner, obviously cannot meet save with very great difficulty.

McDONOUGH, C. J., and CROCKETT, WADE and WORTHEN, JJ., concur.

3. 1956, 5 Utah 2d 224, 300 P.2d 596.

4. 1955, 4 Utah 2d 153, 289 P.2d 1044.