## MILL v. BROWN, Judge.

No. 1749.   Decided January 17, 1907 (88 Pac. 609).

1. CERTIORARI—SCOPE OF INQUIRY.  While, on certiorari to review a judgment, the question of the judge's right to hold the office, whether by reason of the invalidity of the law under which he was chosen or appointed, or because of his want of the proper qualifications, cannot be considered, the question whether the law under which he acts, and on which the validity of his acts depends, is unconstitutional may be considered.

2. COURTS—CREATION—POWER OF LEGISLATURE.  Laws 1905, p. 182. c. 117, establishing juvenile courts, is not unconstitutional because conferring on them jurisdiction and powers previously exercised by the district courts; Const. art. 8, section 1, vesting the judicial power in a Supreme Court, in district courts, in justices of the peace, and in such other courts inferior to the Supreme Court as may be established by law.

3. STATUTES—SPECIAL LEGISLATION.  Laws 1905, p. 182, c. 117, creating juvenile courts in cities of the first and second classes, with exclusive jurisdiction within their limits over juvenile offenders, is not special legislation.

4. SAME—AMENDMENTS—TITLES OF ACTS.  Laws 1905, p. 182, c. 117, creating juvenile courts in cities of the first and second classes, being an independent and complete act in itself, not purporting to amend any other act, is not an amending act, within the provision of the constitution as to the title of such acts, though incidentally it affects some older laws.

5. INFANTS—PROCEEDINGS AFFECTING CUSTODY.  Laws 1905, p. 182, c. 117, creating juvenile courts, with jurisdiction to provide for custody of "delinquent children" as defined by it, not being a criminal law, but having for its object the surrounding of such children with proper environments, violates no constitutional provisions because not providing for trial by jury, for arraignment and plea, a warrant to bring a child before the court, for notice to his parent, or because of the manner of trial and examination, and the child being required to be a witness.

6. CONSTITUTIONAL LAW—DUE PROCESS — CRIMINAL PROSECUTIONS.— Laws 1905, p. 186, c. 117, sec. 7, providing that where a child shall be a "delinquent child" as defined by the act, the parent responsible for or by any action encouraging, causing, or contributing to the delinquency of such child, shall be guilty of a misdemeanor, and, when a complaint is made against him, he shall be brought before the juvenile court, and be examined by it, and, if guilty, such court may on his conviction impose conditions on him, and, so long as he shall comply therewith to its satisfaction, the sentence may be suspended, is unconstitutional, as denying such parent the right of a trial as for any other crime.

7. STATUTES—PARTIAL INVALIDITY.—Laws 1905, p. 182, c. 117, creating juvenile courts with jurisdiction to provide for the custody of "delinquent children" as there defined, is not otherwise affected by the invalidity of section 7 (page 186) relative to punishing the parent responsible for delinquency of a child, this being in no way connected with the principal provisions of the act.

7. INFANTS—PROCEEDINGS AFFECTING CUSTODY—FINDINGS AS TO PARENT'S FITNESS.—Even if there is nothing in Laws 1905, p. 182, c. 117, creating juvenile courts, with jurisdiction to provide for custody of "delinquent children," as therein defined, requiring the court, in taking the custody of a child from its parent and committing it to another, to find, in addition to the fact of the child's delinquency, that the parent is incompetent or has neglected its duty, yet, there being nothing to the contrary, the act will be construed to require it, in view of Revised Statutes 1898, section 82, providing that a parent cannot be deprived of the custody of a child unless it is made to appear that he is unfit or incompetent to have such custody.

Application by Emil Mill for certiorari to review the proceedings of Willis Brown, Judge of the juvenile court of Salt Lake city, state of Utah.

JUDGMENT ANNULLED.

*N. W. Sonnedecker* for appellant.

*Benner X. Smith, Frank B. Stephens,* and *James Ingebretzen* for respondent.

FRICK, J.

This is an application to this court, in its original jurisdiction, for a writ of certiorari. The application is made un-

der section 3631, Revised Statutes 1898, by Emil Mill (hereinafter styled applicant) as father of Albert E. Mill, a minor. The writ was duly issued by this court, directed to Willis Brown, as judge of the juvenile court of Salt Lake City, who made and filed his return by filing an answer in connection with what purports to be a transcript of the proceedings of the juvenile court which it is sought to have reviewed by this application. From the application and return it appears that Albert E. Mill is a minor of about the age of thirteen years; that a complaint in writing was duly filed in the juvenile court against him as a delinquent child under chapter 117, p. 182, Laws Utah 1905, entitled "Juvenile Courts;" that in such complaint he was charged with petit larceny for taking a box of cigars, was found guilty of that charge, and ordered committed to the Industrial School of the State of Utah as a delinquent child until he shall have attained the age of twenty-one years, unless sooner released by the board of control of said institution. The proceedings of the hearing and the judgment of the court are attacked upon various grounds, some of which will be noticed hereafter, and those presently noticed are: That chapter 117, aforesaid, is unconstitutional and void; that the judge of said court does not possess the legal qualifications to act as judge of said court; and that he was not chosen or appointed in accordance with law. While the record of the proceedings certified up is somewhat meagre and unsatisfactory, sufficient appears therefrom to warrant us in reviewing the essential parts of the proceedings.

At the threshold of this investigation we are met by the respondent with two propositions: (1) That we cannot, in this proceeding, examine into and pass upon the constitutionality of said chapter 117; and (2) that we cannot pass upon either the regularity or manner of appointment or the qualifications of respondent.

In view of the nature of the inquiry before us, we cannot accede to the first of the two propositions above stated. True, if the inquiry were limited to the determination as to whether the respondent was entitled to hold the office as juvenile

judge under a certain law, then we could not, in this proceeding, inquire into, and pass upon, the constitutionality of the law under which he held the office. The inquiry, however, is much broader. The attack upon the law is that it affects the rights of the applicant, regardless of whether the respondent is holding the office legally or otherwise. If the law be unconstitutional, then the acts of the respondent which affect the rights of the applicant have no support, and are, therefore, void and of no force or effect. This inquiry goes directly to the power—jurisdiction—of respondent to act, not to his qualification to do so, and hence can be inquired into in this proceeding. We cannot assent to the doctrine that a citizen affected by a law may not, at any time and in any judicial proceeding, attack that law as being unconstitutional and therefore void. An unconstitutional law by which it is sought to affect the rights of the citizen is of no force or effect and would not bind any one. (*Norton v. Shelby County,* 118 U. S. 425-442, 6 Sup. Ct. 1121, 30 L. Ed. 178.) Any act, therefore, of the respondent affecting the applicant's rights, if such act is based upon an unconstitutional law, is both without and beyond jurisdiction, and therefore void. The first objection cannot be sustained.

The second objection, however, is well taken. If the acts complained of are supposed to be illegal only because the respondent was chosen or appointed under a supposed invalid law, or because he does not possess the proper qualifications, then the attack must be direct, not a collateral one. But this is so because the respondent would, in such a case, still act as judge, if not under strict legal right, then as one in fact. His legal right to act would have to be determined by a direct proceeding for that purpose. This principle of law is not changed by the fact that the same statute or law under which he acts also provides for his qualifications, election or appointment. This principle is well established by the following authorities: *Scheiwe v. Holz,* 168 Ill. 432, 48 N. E. 65; *Fraser v. Freelon,* 53 Cal. 644; *State v. Osburn,* 24 Nev. 187, 51 Pac. 837; *Coyle v. Sherwood,* 1 Hun (N. Y.) 272;

*Nelson v. People,* 23 N. Y. 293; *People v. Whito,* 24 Wend. (N. Y.) 520-526.

There are many other constitutional objections presented which we shall not notice or discuss in detail, for the reason that they are all thoroughly considered by the courts whose decisions we will cite hereafter, and which are all determined against the contentions of the applicant. Apart from the general objections just referred to above, there are several that are directed specially to some of the provisions of our Constitution. It is asserted, for instance, that chapter 117 is unconstitutional because (1) it confers jurisdiction and powers upon a court created by an act of the Legislature which are now discharged by the district courts, which courts are constitutional courts; and (2) because, in the state at large, the powers of juvenile courts are still to be exercised by the district courts, while in cities of the first and second classes such is not the case. This contention is not tenable. The classification of cities for certain purposes is too well established to require discussion. But the fact that certain powers or duties may be exercised by certain courts does not prohibit the Legislature from creating new courts and conferring upon those like powers and duties. Indeed, our Constitution seems to have been framed with this object in view. Section 1 of article 8 vests the judicial powers of this state . . . in a Supreme Court, in district courts, in justices of the peace and such other courts inferior to the Supreme Court as may be established by law." While there are certain limitations in respect to certain powers as applied to certain courts, the Constitution wisely refrains from conferring exclusive original jurisdiction upon any of the courts, but vests such original jurisdiction in all the courts to be apportioned and exercised as the Legislature may direct. There can be no valid reason, therefore, to dispute the right of the Legislature to create a court or courts wherein juvenile offenders or delinquents may be dealt with although they were formerly dealt with in other courts. Nor does the fact that in cities of the first and second classes juvenile courts are given exclusive jurisdiction over juvenile offend-

ers in any way offend against any constitutional provision. The object is to relieve already over-crowded courts in such cities from this burden, and confer the power to deal with children belonging to the class defined in the act upon the courts especially designed and adapted to carry into effect the provisions of the act. Nor does it in any way contravene any constitutional provision, because the act devolves the duties of the juvenile courts, as exercised by them, in cities of the first and second classes, upon the, district courts held outside of such cities. The act, for this reason, is not obnoxious to the uniformity clause of the Constitution. Uniformity, in the sense used in the Constitution, simply means uniformity in respect to the class into which a subject-matter may be classified, upon which the law is to operate. The children are dealt with precisely the same whether they are brought before a juvenile court in the city or before a district court in the state at large. The law operates in the one instance precisely as in the other. The only difference is that a district court in the state at large may be required to pass upon fewer cases. The law was enacted for the express purpose of relieving the district courts in cities of the burden, and thus give them the opportunity the country courts have to confine their work more strictly to contested law and equity cases. The law, therefore, aims at uniformity, in one sense, rather than at the opposite. The district courts are not deprived of any constitutional right or power by chapter 117 by reason of conferring jurisdiction upon juvenile courts. (11 Cyc. 711; *State v. Archibald,* 52 Ohio St. 1, 38 N. E. 314; *Hagany v. Cohnen,* 29 Ohio St. 82.)

Nor is the objection valid that chapter 117 is against that provision of the Constitution which prohibits the Legislature from amending any law or section without setting forth the new section as amended. Chapter 117 is an independent and complete act in itself. It is not intended thereby to directly amend or modify any other law or section. If such is its effect, it is so incidentally or by implication merely. The provision of the Constitution now under consideration

was not intended to prevent new legislation that might incidentally affect older laws without setting forth all the laws that might incidentally be affected by the new ones. If the constitutional provision were thus construed, new legislation would be made almost impossible; it would at least impose intolerable burdens·upon both the Legislature and the courts, and would, in the end, be of much greater mischief than the one sought to be avoided. This objection, therefore, is likewise untenable. (Cooley's Const. Lim. [7th Ed.], 216; 1 Lewis' Suth. Stat. Const. [2d Ed.] 239-240.) The case of *State v. Beddo,* 22 Utah 432, 63 Pac. 96, illustrates a clear attempt to· amend different sections without complying with the constitutional provision above referred to, and this, it was properly held in that case, could not be done. If, however, that case admits of a construction contrary to the doctrine above stated, then it would be in direct conflict with the authorities last-above cited, and contrary to the rule approved and adopted by the great weight of authority upon the subject of affecting or amending existing laws incidentally or by implication, by new and independent acts, and therefore could not stand as an authority except so far as it is in harmony with the rule here adopted.

There are some constitutional objections to certain portions of the act that are more serious, however, namely, the objection that respondent's appointment, is delegated to a special commission created by the act, and that his salary is to be˄ fixed by such commission, to be paid out of the city treasury, may well be said to reach, if they do not go beyond, the limit of the Legislature to invade local self-government as the same is implied by the spirit, if not the letter, of our Constitution. These are matters upon which we entertain serious doubts. But, as these matters go again to the.right of the respondent to discharge the duties of the office as an officer *de jure* merely, we cannot, in this proceeding, pass upon or decide them. Moreover, as at present advised, we assume, but do not decide, that even if the portions of the act above referred to were held to be bad, that they are not so connected with the other portions of the act as to vitiate

the whole law. The act would still create a *de jure* office which could be filled by a *de facto* officer, and all the other portions dealing with and affecting juvenile delinquents would still stand and be made effective in accordance with the true spirit and intent of the act taken as a whole. This does not apply to section 7 to which we will refer hereafter.

The order constitutional and legal objections respecting the right to trial by a jury, the want of arraignment and plea, the suspending of judgment or sentence, the manner of examination or trial, that the child is required to be a witness against himself, the want of notice to the parent, the dispensing with the warrant and arresting the child and bringing him before the court, and all like questions, are fully, learnedly and satisfactorily discussed and decided against the contentions of applicant in the following cases: *Commonwealth v. Fisher* (Pa.), 62 Atl. 198; *Milwaukee Industrial School v. Supervisors of Milwaukee County,* 40 Wis. 328, 22 Am. Rep. 102; *Prescott v. The State,* 19 Ohio St. 184, 2 Am. Rep. 388; *Farnham v. Pierce,* 141 Mass. 203, 6 N. E. 830, 55 Am. Rep. 452; *State v. Home Society,* 10 N. D. 493, 88 N. W. 273; *Reynolds v. Howe,* 51 Conn. 472; *Ex parte Liddell,* 93 Cal. 633, 29 Pac. 251; *Ex parte Nichols,* 110 Cal. 651, 43 Pac. 9; *State v. Phillips,* 73 Minn. 77, 75 N. W. 1029; *In re Mason,* 3 Wash. St. 609, 28 Pac. 1025; *In re Kelley,* 152 Mass. 432, 25 N. E. 615; *State v. Kilvington* (Tenn.), 45 S. W. 433, 41 L. R. A. 284; *Matter of Knowack,* 158 N. Y. 482, 53 N. E. 676, 44 L. R. A. 699; *Jarrard v. The State,* 116 Ind. 98, 17 N. E. 912; *State v. Brown,* 50 Minn. 353, 52 N. W. 935, 16 L. R. A. 691, 36 Am. St. Rep. 651; *State v. Marmouget,* 11 La. 225, 35 South. 529. It would not only seem useless to enlarge upon the reasons in the foregoing cases why acts similar to chapter 117 do not contravene constitutional or substantial rights, except perhaps in the particulars above referred to, but it would smack of pedantry to attempt to do so. There is not a single argument presented by applicant in this case which is not considered and answered in the foregoing cases. Quite true, there are a few cases seemingly to the contrary. One

of those is *State v. Ray,* 63 N. H. 406, 56 Am. Rep. 529.
While the argument of the court in that case is adverse to
many of the decisions cited above, the question involved in
nearly all of the cases above cited and involved in the case at
bar was not in issue, and hence the New Hampshire case is
not an authority. The law passed upon in that case did not
confer the power upon the justice to take the action taken by
him, and thus he exceeded his authority. No other question
was involved, and hence no other could be decided. The case
of *People v. Turner,* 55 Ill. 280, 8 Am. Rep. 645, was de-
cided more than thirty-five years ago, and while, in that case,
some of the contentions of counsel for applicant were up-
held, nearly all of the cases decided since then, as appears
from the list above cited, have taken a different, and, as it
seems to us, a more rational view of the subject. The pro-
cedure in the state of Illinois in respect to juvenile offenders
has, however, been changed since the decision of *People v.
Turner,* supra, and such laws are now upheld in that state,
as can be seen from the later cases of *Petition of Ferrier,*
103 Ill. 367, 43 Am. Rep. 10, and *County of McLean v.
Humphreys,* 104 Ill. 378. Such laws are most salutary and
are in no sense criminal and not intended as a punishment,
but are calculated to save the child from becoming a criminal.
The whole and only object of such laws is to provide the
child with an environment such as will save him to the state
and society as a useful and law-abiding citizen, and to give
him the educational requirements necessary to attain that
end. To effect this purpose some restraint is essential. Such
or similar restraint is, however, necessary in any institution
of learning, however humble. Everywhere we are all met
with restraint. Civilized society cannot exist without it, and
no school can continue without discipline, and it is this dis-
cipline which is denominated restraint in schools such as are
provided for juvenile offenders. We can see no valid rea-
son for holding chapter 117 vulnerable to attack upon consti-
tutional or other grounds, and therefore we cannot, for that
reason alone, sustain the contentions of the applicant and set
aside the judgment of the juvenile court.

The foregoing does not apply to section 7 of said chapter. By the provisions of said section the juvenile court deals directly with adult persons. While the provisions of section 7 are entirely germane to the principal object of the main act, the acts denounced in section 7 are made a misdemeanor, and are thus a crime within the purview both of the Constitution and the Criminal Code of this state. As we have already pointed out, the proceedings of the juvenile court do not fall, nor are they intended to come, within what is termed criminal procedure, nor are the acts therein mentioned, as applied to children, crimes. To constitute the act under section 7 of an adult a crime, entitles such adult to the right of a trial as for any other crime. This right is denied by said section 7 and it cannot, therefore, be upheld. Quite true, some method is necessary to punish adults when interfering with children who may be held to be wards of the state, and no doubt it is proper for the Legislature to provide for their punishment. When such is done, however, trial must be provided for in the proper forum and in legal manner. Section 7 of the act, for the reason that it violates this elementary provision, so to speak, of criminal law and procedure, must, therefore, be held of no force or effect. This, however, in no way affects the other provisions or sections of the act. Section 7 was a mere excrescence, in one sense, on the principal provisions of the act, in no way connected with it so far as it affects the right to deal with children, and, as is clearly apparent, was not an inducement to the enactment of the other portions of the act. For these reasons, all other parts of the act may, and are permitted to, stand.

But there is another reason for which we think the judgment cannot be permitted to stand. By a careful examination of the cases above cited, it will be found that all the decisions rest upon the proposition that the state in its sovereign power has the right, when necessary, to substitute itself as guardian of the person of the child for that of the parent or other legal guardian, and thus to educate and save the child from a criminal career; that it is the welfare of the child that moves the state to act, and not to inflict punish-

ment or to meet out retributive justice for any offense committed or threatened. In other words, to do that which it is the duty of the father or guardian to do, and which the law assumes he will do by reason of the love and affection he holds for his offspring and out of regard for the child's future welfare. The duty thus rests upon the father first. As the duty is imposed by the moral as well as the laws of society upon the father first, so it must likewise logically follow that he must be given the first right to discharge that duty. Indeed, the common law based the right of the father to have custody and dominion over the person of his child upon the ground that he might better discharge the duty he owed the child and the state in respect to the care, nurture, and education of the child. The right and duty are therefore reciprocal, and may be termed natural, as well as legal and moral. Before the state can be substituted to the right of the parent it must affirmatively be made to appear that the parent has forfeited his natural and legal right to the custody and control of the child by reason of his failure, inability, neglect, or incompetency to discharge the duty and thus to enjoy the right. Section 6 of the act defines the acts which constitute a child a delinquent and thus a fit subject to be brought before the juvenile court for examination. To bring the child before the court, the act provides that a complaint in writing must be filed, which was done in this case. But when a complaint is filed and one or more of the acts constituting delinquency are set forth the court only acquires jurisdiction of the child for the purpose of investigating into its condition or conduct. Quite true, in some states, a formal complaint in writing may not be an essential, but it is made so in this state, and hence must be observed. But when the court has investigated the matters set forth in the complaint and finds some or all of the charges to be true, it does not follow, from that fact alone, that the state should forthwith be substituted in place of the parent or legal guardian and take full control of the person of the child. All that the court has established so far is that the child is a delinquent in view of the provisions of the act. The question as to

whether the parent has been derelict in respect to his duty, or whether he is a competent person or not to have charge of the child, and whether he has forfeited his natural and legal right to continue the relation, has not been touched upon, and no finding or adjudication of that fact has been made. There is nothing, therefore, up to this point, in the proceedings upon which a judgment can be based substituting the state as guardian of the person of the child in place of the parent. The whole fabric of the law, as is clearly shown by all the decisions cited, supra, rests upon this theory, and those laws are sustained by virtue of it. Until something is made to appear that the child is not cared and provided for in respect to the matters involved, there exists no reason for the state to take charge of the person of the child, and hence no right exists to do so under the act. True, the parent need not be made a party to, or even have notice of, the proceedings against the child. The parent is not bound by the judgment against the child, and may at any time institute proper proceedings to obtain custody of him. But the matter now under consideration lies deeper than this; it is one of power to render judgment placing the child in charge of one guardian, the state, before determining or passing upon the qualifications of the natural guardian to have charge of the child. The court might as well enter up a judgment without any complaint or investigation whatever. The relative rights and duties of the father or mother are so well and thoroughly discussed in the case of *Nugent v. Powell,* 4 Wyo., at pages 189 to 199, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 117, that we shall do no more than to refer to the discussion there presented. Moreover, in nearly all cases cited in this opinion, the fact of the dereliction, negligence, or incompetency of the parent is referred to as a ground for the exercise of the state of its right in respect to the child's custody. Indeed, in some of the cases it appears that this fact is made a part of the complaint and made a ground for the court to act, and in most of them the fact is found and adjudicated. While there is no express provision in chapter 117 requiring the juvenile court to find one way or the other in respect to the

competency of the parent, still it appears from various portions of the act that the Legislature intended that the matter should be inquired into. It provides that the parentage should be investigated and reported upon to the district courts by their probation officers in the state at large, and in cities of the first and second classes the juvenile judge and his probation officers, it is clearly implied, must do the same. Some of the acts constituting delinquency as defined by section 6 of the act are so trivial in themselves that any thoughtless boy might commit them and thus be adjudged a delinquent, and by a careless judge be sent to the industrial school when the parent was not only willing, but most competent, to have control of the child, and would offer it better surroundings and training than the state at best could give or afford. We are constrained to hold, therefore, that before a child can be made a ward of the state, at least two things must be found: (1) That the child is a delinquent within the provisions of chapter 117; and (2) that the parent or legal guardian is incompetent or has neglected and failed to care and provide for the child the training and education contemplated and required by both law and morals.

The foregoing conclusions are based upon what we conceive to be the true spirit and intent of the act itself. If it should be contended that nothing appears in the act requiring such a finding to be made, then we must still construe it in the light of other provisions of the law which may affect the relation of parent and child, and the rights of the parent, in view of such relation. Such a provision is found in section 82, Revised Statutes 1898, where it is expressly provided that a parent cannot be deprived of the custody of the child unless it is made to appear that he is unfit or incompetent to have such custody. We are doing no more, therefore, in requiring such a finding to be made, than is enjoined by positive law of this state. The act itself, where it is silent, must be construed in connection with other provisions upon the same subject. Unless, therefore, both the delinquency of the child and incompetency, for any reason, of the parent, concur and are so found, the court exceeds its power when

committing a child to any of the institutions contemplated by the act. While we do not wish to be understood as holding that investigations before juvenile courts must be conducted as trials usually are, still these courts should not disregard all rules of procedure. The law requires a written complaint to be filed, hence there should also be an investigation of the matters set forth in the complaint and witnesses examined, under oath, with the right of cross-examination. Since there is no appeal, and can be none in these cases, there should be as thorough an examination into the matters complained of as the nature of the case admits, under all the circumstances. We desire to observe also that while the parent or guardian is not legally a necessary party to the proceedings, and should not, and cannot be bound by any judgment rendered in the juvenile court respecting his rights to the custody and control of the child, yet, in view that he is affected, it perhaps were better that a formal notice of the hearing be served on him, if he can be found, to the end that all the facts may be elicited by the investigation. The whole proceedings should be conducted so as to subserve the rights and best interests of all, while in no way minimizing the beneficent purposes of the law itself. While, in the very nature of things, these courts cannot conform to the rigorous rules of criminal and law courts, their proceedings should still be conducted as a legal investigation.

From an inspection of the record in this case, meagre as it is, we are forced to the conclusion that the difficulties complained of are due far more to the respondent than to the law. To administer juvenile laws in accordance with their true spirit and intent requires a man of broad mind, of almost infinite patience, and one who is the possessor of great faith in humanity and thoroughly imbued with that spirit. Those who come, and are intended to be brought, before juvenile courts must be reached through love, not fear. The purpose in bringing them before the court is to lead them away from, and to destroy their propensities to, vice; to elevate, not degrade; to reform, not to punish them. Their parents likewise must be met and dealt with in the same spirit.

They should be directed in a proper spirit, and not, as this record discloses, be met with defiance. The conditions surrounding them may be due as much to lack of information and misfortune as to viciousness. The judge of any court, and especially a judge of a juvenile court, should therefore, be willing at all times, not only to respect, but to maintain and preserve, the legal and natural rights of men and children alike. Respondent, as this record discloses, either has no regard for, or is uninformed in respect to, the rules that the experience of past generations has evolved for the purpose of safeguarding the rights of all. Like most laymen, but seemingly without their good judgment, respondent seems to regard these rules as mere technicalities to be brushed aside as obstructions in the pathway of what is usually termed "common-sense justice." He seems to be a willing convert to the theory that he is better, if not wiser, than both law and rules of procedure, and that he may thus disregard either or both at pleasure. While juvenile courts cannot, and are not expected to, be conducted as criminal or other courts usually are, the judge should still not wholly disregard all wholesome rules in an attempt to establish guilt which he suspects, or, worse yet, merely imagines. Most of the rules of evidence and procedure were established, and their observance is necessary, to curb the propensities of the inquisitor, and it would, no doubt, better subserve the best interests of all if the most important of these rules were observed by respondent in his investigations. The fact that the American system of government is controlled and directed by laws, not men, cannot be too often nor too strongly impressed upon those who administer any branch or part of the government. Where a proper spirit and good judgment are followed as a guide, oppression can and will be avoided.

It further appears from the record before us that either respondent, or some one for him, has devised a printed record to which all cases are made to conform. Printed formulas are well enough as guides, but to have a printed record only is too much of a temptation to make every case fit the record instead of making a record to fit the case. As we have

already stated, the cases coming before the juvenile court are not criminal, and hence a criminal record does not fit those cases. Findings should be made in each case in conformity with the facts, and judgment rendered in accordance with the facts found.

Because a good and wholesome law has, in some instances, been abused, we are most earnestly implored to set aside the law. This we cannot do. The court may be reformed and the law amended, if, in the judgment of the Legislature, this is necessary. All good laws may be, and at times no doubt are, abused, but this is no reason why they should either be held bad or repealed. While it is neither the duty nor the province of this court to suggest what the laws should be, or who should administer them, we cannot silently pass by what seems to us a total disregard of wholesome rules. The juvenile court law is of such vast importance to the state and society that it seems to us it should be administered by those who are learned in the law and versed in the rules of procedure, to the end that the beneficent purposes of the law may be made effective and individual rights respected. Care must be exercised in both the selection of a judge and in the administration of the law. When this is done, we have no doubt that most of the things complained of, and as they appear from the record, will be obviated. The juvenile law of this state is of too much importance to be hampered by or set aside for trivial or avoidable causes. All good citizens are interested in its proper administration and enforcement, and it is well worth the best efforts and patient care of those who, for the time being, are clothed with the power of administering such laws. If all governments are interested in the moral and educational welfare of those who in time will be called upon to discharge the duties of citizenship, how much greater should be that interest in a government like ours, where the citizen is the sovereign from whom emanates all the powers of government?

For the foregoing reasons, therefore, the judgment of the juvenile court committing Albert E. Mill to the Industrial School is set aside and annulled, and he is returned to the

custody of Emil Mill, his father, until said Albert shall be legally adjudicated to be a ward of the state in accordance with the views herein expressed; neither party to recover costs. It is so ordered.

McCARTY, C. J., and STRAUP, J., concur.