WILLIAM CLIFFORD WILSON, petitioner, v. JOSEPH S. COUGHLIN, director of Correctional Institutions for State of Iowa, ANTHONY P. TRAVISINO, Superintendent of State Training School for Boys, and HON. PAUL E. HELLWEGE, Judge, Hardin County District Court, respondents.

No. 52273.

DECEMBER 13, 1966.

H

C. A. Frerichs, of Waterloo, for petitioner.

Lawrence F. Scalise, Attorney General, and Robert Bernstein and David J. Elderkin, Assistant Attorneys General, for respondents.

LARSON, J.—When William Clifford Wilson, age 16, was ordered transferred from the Training School for Boys to the Men's Reformatory under the provisions of section 218.91, Code 1966, he filed a petition for writ of certiorari in this court on May 27, 1966. On June 13 we granted a writ to review this order but denied the request that petitioner be returned to the Training School for Boys.

Petitioner contends the Hardin County District Court was without jurisdiction and acted illegally in granting an order transferring him from the Training School for Boys to the Men's Reformatory for custodial care, and that section 218.91 of the 1966 Code of Iowa, under which it purported to act, is unconstitutional, being in violation of the due process clauses of both the State and Federal Constitutions, i.e., Amendment 14 to the United States Constitution, and Article I, sections 9 and 10, of the Iowa Constitution, and of the equal protection clause of Amendment 14 to the United States Constitution. We find no merit in these contentions.

 There was more than ample justification for the order. From the record we learn petitioner was determined a juvenile delinquent by the Polk County Juvenile Court and was duly committed to the Training School for Boys at Eldora. After considerable custodial difficulty with him at the school and, while on parole, the State Director of Correctional Institutions and the superintendent of the school instituted proceedings under the provisions of section 218.91 of the Code to have him transferred to the State Men's Reformatory at Anamosa.

It appears petitioner's juvenile history dates back to August 1963 when he was involved in a breaking and entering. The juvenile court then placed him in Boys Town, Nebraska. Three weeks later he ran away and stole an automobile. When apprehended, he was restrained for some time in the Omaha, Nebraska, Juvenile Home, and when later released to a married brother, he again became involved in a breaking and entering. His commitment to the Iowa Training School for Boys followed on December 31, 1963.

At the training school he was first placed in a cottage, then removed to the medium security unit called the Health Center. His behavior, or misbehavior, caused him to be sent to this Center on five different occasions, and during that period he ran away from the school three separate times, and caused trouble among the other inmates.

In August 1965, after nineteen and a half months at the school, petitioner was paroled to his parents. This parole was revoked and he was returned to the school in October 1965 when he would not attend school and became involved in the theft of an automobile and some old coins. On March 11, 1966, a special leave was granted him to find employment in the Waterloo area. This "leave" was to terminate in a parole if he made a satisfactory adjustment at his employment. However, he found no employment and was returned to the training school at Eldora some twenty days later when he was involved in a drunkenness episode, assisted in stealing two cars, and helped cut up convertible tops on other automobiles.

Being convinced petitioner's presence at the school would not be conducive to his welfare or the welfare of the other inmates of the school, the authorities decided he should be transferred to the reformatory for custodial care and treatment. On the 12th day of May, 1966, this application for such transfer was granted, and since that time he has been cared for in that correctional institution. Apparently the change of place of confinement is not to his liking and he asks us to find the transfer invalid.

Section 218.91, as now found in the 1966 Code of Iowa, being in effect on May 12, 1966, provides as follows:

"The board of control or the director of corrective institutions may order the transfer of inmates of the training school for boys to the men's reformatory for custodial care whenever it is determined that such action will be conducive to the welfare of the other inmates of the school. Such transfer shall be effected by application in writing to the district court, or any judge thereof, of the county in which the said training school is situated. Upon the granting of the order of transfer, the transfer shall take place. The county attorney of the said county shall appear in support of such application. The cost of the transfer shall be paid from the funds of the training school for boys. Subsequent to a transfer made under this section, the person transferred shall be subject to all the provisions of law and regulations of the institution to which he is transferred, and for the purposes of chapter 745 such person shall be regarded as having been committed to the institution."

This section does not violate the fundamental law, federal or state.

■ I. The burden resting upon one alleging a provision of the Code unconstitutional is a heavy one, for there is a presumption that all legislative acts are constitutional. Petitioner must show to the court exactly which constitutional provisions are infringed upon and in what manner. Cook v. Hannah, 230 Iowa 249, 252, 297 N.W. 262; Spurbeck v. Statton, 252 Iowa 279, 283, 106 N.W.2d 660 (1960).

In Cook, we said: "The power to declare legislation unconstitutional is one which courts exercise with great caution, and only when such conclusion is unavoidable. [Citing cases] And the presumption in favor of constitutionality is especially strong where the statute, like the one before us, was enacted to promote a public purpose, * * *."

In Spurbeck, we said: "At the outset we state some well-established general principles pertinent in all considerations of constitutional questions. Thus, all presumptions are indulged in favor of constitutionality; he who attacks the constitutionality must prove invalidity beyond a reasonable doubt; the fact that a law may work hardship does not render it unconstitutional; if any reasonable basis which supports the statute may be con-

ceived it will be upheld; the courts have no concern with the wisdom, justice, policy or expediency of a statute, and are not responsible for the presence or absence of those elements in an Act of the legislature. These rules have been stated over and over again in many cases, some of them quite recently."

██ With these rules well in mind, the District Court of Hardin County agreed with the state authorities that there was no showing section 218.91 of the Code clearly, plainly, palpably, and without doubt, infringed upon the fundamental laws, state or federal, and granted this transfer. We affirm its action.

II. Title XI of the Code 1966 relating to Social Welfare and Rehabilitation, including chapter 218, provides that the board of control or its designee shall have the control, management and operation of certain custodial institutions of the State, including the Training School for Boys and the Men's Reformatory. Section 218.1, Code, 1962-1966. Sections 218.77 and 218.78 provide for the appointment and duties of a director of corrective institutions under the board, including penal, reformatory and correctional institutions. Among his duties he shall "Establish and maintain acceptable standards of treatment, training and education in the various state penal and corrective institutions" and "Develop a program in corrective institutions for juveniles designed to rehabilitate the inmates and patients, and institute a program of placement and parole supervision for all parolees of said corrective institutions for juveniles." Section 218.91, supra, provides for transfers from the training school to the reformatory.

There is no contention made here that the authorities did not comply with these provisions. In other words, petitioner was properly committed to the Training School for Boys and the prescribed procedure was followed in making the transfer. Petitioner, as a delinquent child, was committed to the state board of control for placement at a state training school under provisions of section 232.34 of the Code. Section 232.35 provides: "Commitment to the state board of control shall vest guardianship of the person of the child so committed in the board and shall terminate the court's jurisdiction."

Petitioner was not charged or convicted of a crime, and his confinement in a state institution under the board of control is for the purpose of education, discipline and rehabilitation. Section 242.2, Code. Petitioner's detention is custodial, not penal in nature, but the security provisions necessary for his detention are, in the first instance, strictly up to the boy. If he cannot be detained at the school, the board is given permission to transfer him to a more secure facility. By doing so, he is not being punished and is not treated as a prisoner. He has no term to serve, has no record placed against him, and must be classified as a juvenile in parental custody. He is not permitted association with older prisoners. Section 246.36. His commitment or detention is not that of a convict.

III. Due process does not require an indictment or jury trial in a proceeding to commit a delinquent and incorrigible child to a state institution. Wissenburg v. Bradley, 209 Iowa 813, 816, 229 N.W. 205, 67 A. L. R. 1075. Also see annotations commencing on page 1082 of 67 A. L. R. This decision apparently settled that proposition in this jurisdiction, for we find no later pronouncement on it.

In Wissenburg on pages 816 and 817 we point out a juvenile committed to the custody of the board of control is not being tried or punished for any crime. "The action is, in a sense, a special proceeding provided by statute, wherein the state, by virtue of its authority as *parens patriae*, takes jurisdiction of the incorrigible child, and commits it, not to jail for punishment, but to a reformatory, for its care, education, and training. That such a statute and such a proceeding, without a trial by jury, does not violate either the Federal or the state constitutional provisions, has been repeatedly held." We further stated such statutes relating to confinement and custody are not criminal or penal. "They are not intended as a punishment, but are calculated to save the child from becoming a criminal." They are characterized by the courts generally as progressive and humanitarian. Many cases are cited for this proposition. We concluded there: "The statute not being criminal in its nature, nor designed for punishment, and the commitment being for the benefit of the child and for its education and reformation, * * *

1170

the due process of law clause does not, in such a case, require a jury trial." (Citing many cases in many jurisdictions)

Here, in a civil proceeding, the State simply assumed its function as personal guardian of petitioner, and undertook his custody and care.

In an early case of Wisconsin Industrial School v. Clark County, 103 Wis. 651, 664, 79 N.W. 422, 426, the Wisconsin court stated: "The power to place children under proper guardianship has been exercised by chancellors and judges exercising chancery powers from time immemorial."

It must, therefore, be concluded petitioner's commitment to the state board of control for care and treatment was perfectly legal, was not criminal in nature, and left it in the position of his parent. Section 218.91 permitted the board, as such, to transfer an incorrigible child to the reformatory for his own benefit and protection, and in order to guard against any hasty or arbitrary action requiring approval of the district court before the transfer was completed.

In making this transfer, the board is presumed to be performing a duty imposed upon it, that of restraint, education and reformation. It is not restraining the natural liberty of the child, but is placing him under a natural restraint, a restraint so far as is practicable as should be exercised by a parent. In other words, the severity of the restraint is governed entirely by the actions of the child resisting parental authority. It is not like the unnatural restraint of one convicted of a crime where the restraint is punishment. Rather it is only for so long as the child needs a firm restraining hand, and it may end anytime the child shows a willingness to behave.

Here we are told the state board has tried every other way to exercise proper parental authority, with no appreciable effect. There was no other place of custodial care where he could receive proper education, care, and rehabilitative training. While we may not feel restraint in a place generally used and occupied by convicted felons is quite proper for a child of 16 years, yet this seems to be a policy question for the legislature, not the courts. Perhaps an intermediate facility should be provided, but that is not our problem here. There is no constitutional prohibition

known to us which bans association between persons convicted of crimes and others, even children. We have been cited no recent legal authority which holds an institution usually housing criminals is an improper institution for the restraint of a minor delinquent, or that due process is violated by his care and retention in such an institution. On the other hand, several state cases and many Federal decisions seem to reach the opposite conclusion. See Long v. Langlois, 93 R. I. 23, 170 A.2d 618 (1961); In re Darnell, 173 Ohio St. 335, 182 N.E.2d 321 (1962); Cope v. Campbell, 175 Ohio St. 475, 196 N.E.2d 457 (1964); Trimble v. Stone, 187 F. Supp. 483 (D. C. 1960); Arkadiele v. Markley, 186 F. Supp. 586 (S. D. Ind. 1960); Clay v. Reid, 173 F. Supp. 667 (D. C. 1959); United States v. McCoy, 150 F. Supp. 237 (M. D. Pa. 1957); and Suarez v. Wilkinson, 133 F. Supp. 38 (M. D. Pa. 1955). In each case the contention was made that the statute which permitted a minor child, previously committed to a training school as a delinquent, to be transferred to a reformatory confining felons without an indictment or trial, was a violation of Amendments 5, 6 and 14 to the United States Constitution or the State Constitution relating to due process. In every instance the contention was rejected.

In Long v. Langlois, supra, where plaintiff applied for a writ of habeas corpus after being transferred to the state reformatory from the Training School for Boys, the court rejected the application and ruled the place of confinement of the child was not in violation of the Federal or State constitution. The Rhode Island transfer statute was much like our own. The court there said at page 27 of 93 R. I., page 620 of 170 A.2d: "This statute, far from defeating the purpose of the juvenile court which is to reform minors brought before it, is designed to aid by giving the right to the assistant director of social welfare to transfer from the school those who, by their actions, are failing to reform and are hurting the rest of the school * * *. After commitment to the school a boy is, in a sense, on his own and his conduct must to a degree determine where he shall remain. If removal of a boy by reason of his conduct is determined upon as a means of saving him or the rest of the school or both, such

determination would appear to be in harmony with the purposes of the juvenile court."

Thus, the place of his detention and treatment is largely up to the delinquent boy, and the association with those who have been convicted of a crime is not a valid reason for denying the State a place to restrain and rehabilitate him. In fact, such associations under certain conditions are permitted in section 242.6 of the Code, where it is provided that the court may in certain instances commit a minor convicted of a felony to the training school for boys, or for girls, as the case may be. We conclude, then, the association is not determinative of the petitioner's rights. It is rather the facilities of the institution to provide the restraint, training, education and opportunity to rehabilitate that must control. There is no showing here that such facilities were not provided.

In the federal cases cited the court is considering the provision of the United States Code which authorizes the Attorney General to order any inmate transferred from one institution to another. Section 4082 of Title 18 provides: "The authority conferred upon the Attorney General by this section shall extend to all persons committed to the National Training School for Boys," and 18 U. S. Code, section 5034, provides: "If the court finds a juvenile to be a delinquent, it may place him on probation for a period not exceeding his minority, or commit him to the custody of the Attorney General for a like period." The court, in Suarez v. Wilkinson, supra, 133 F. Supp. 38, 40, in turning down petitioner's application for a writ of habeas corpus, said: "In order to provide as much flexibility as possible, correctional institutions and 'training schools' have been provided for those juveniles who may benefit thereby. Custody is an essential feature in those cases where parole is not feasible and the nature of such custody, in line with the juvenile's reaction thereto, must necessarily be left to the discretion of those in charge of the problem of rehabilitation."

Under these decisions it would seem unnecessary for the legislature to require district court approval for a transfer of an incorrigible to the reformatory, for it is the board's problem of how and where the boy is to be confined and treated for

proper rehabilitation. However, as we have noted, the legislature safeguarded the juvenile's rights by court review of the circumstances making necessary the transfer. We think he cannot complain of this requirement, and it seems unlikely a court would deny an order of transfer if the circumstances would justify it. We do not consider the court's legal discretion here, but find the court made no mistake in ordering this transfer.

■ IV. Petitioner further contends there is a conflict between section 218.91 and chapter 687 of the Code, which provides that a person convicted of a felony *may* be punished by imprisonment in the penitentiary or men's reformatory. Nowhere do we find in this chapter any provision which states that *only* convicted felons may be restrained or cared for at the men's reformatory. In the absence of any such provision, we find no conflict here. The men's reformatory being simply a custodial institution under the board of control, its use for that purpose has not been restricted to felons, and in fact the contrary appears. There is no merit in this contention.

■ V. Finally, petitioner argues that because one restrained at the men's reformatory is required to obey the rules and regulations of that institution, and is made subject to prosecution for escape from it, as is provided in chapter 745 of the Code, this somehow makes him a prisoner and subjects him to increased punishment without due process of law. The short answer to this contention is, of course, that petitioner is not a prisoner and is not being punished when detained under such paternal custody. His status as a mere delinquent is not changed by this transfer and he is still eligible for parole or release at anytime his conduct convinces the board and directors that he no longer needs that control, and under no circumstances beyond his 21st birthday.

■ Perhaps the penalty for escape from the men's reformatory is greater than from the Training School for Boys, but there is a marked distinction. When a boy runs away from the training school, without a judicial hearing he may be punished by the school authorities. Indeed, petitioner on several occasions has been punished for rule infractions and has summarily been confined in the security or Health Center therefor. In the

reformatory, before he is punished for escape, he is entitled to a trial in the district court. Furthermore, as an inmate of either institution, he has always been subject to criminal prosecution for any crime committed and certainly could be charged with escape when arrested for one of them. At any rate we fail to see how subjecting petitioner to prosecution for escape is an increase in punishment, for it is not punishment at all until he himself has added the crime of escape to his defections against society and has been tried and convicted of that offense.

VI. Having found no basis for sustaining this writ, the same must be annulled and the order of transfer sustained.—Writ annulled.

GARFIELD, C. J., and SNELL, MOORE and STUART, JJ., concur.

BECKER, MASON and RAWLINGS, JJ., dissent.

THORNTON, J., not sitting.

BECKER, J.—I dissent. The gravity of the question involved requires that reasons for disagreement be recorded.

I. Perhaps the best way to start would be with a quotation from a Federal Court faced with a very similar problem in United States ex rel. Stinnett v. Hegstrom, 178 F. Supp. 17, 18:

"The disciplinary problems arising when these youths committed as juveniles proved incorrigible have led to their confinement in a penal correctional institution by order of the Attorney General. This abrupt transition from juvenile ward of the United States to a member of the general prisoner population points up a weakness in the present system. There has been no criminal trial in any of these cases. Due process requires that a youthful criminal either be tried and sentenced as such at the outset, a course which is open in the case of those considered hoodlums or hardened criminals, or if an original decision to invoke juvenile rather than criminal proceedings is made, and proves ill-advised by reason of later misconduct, due process requires some right of trial for the later misconduct which necessitates treatment as a criminal. No provision has been made for either such trial in the instant cases.

"The Fifth Amendment to the Constitution of the United States provides that no person shall be deprived of liberty without due process of law, the Sixth Amendment, that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The record here affirmatively shows that neither this boy, nor the other two transferred with him, had any of the constitutional safeguards mentioned by the Federal Court. Our juvenile courts determine in the first instance whether they will assume jurisdiction or let the matter take a normal adult criminal procedure. Iowa Code, 1966, sections 232.3 and 232.62.

II. The constitutionality of Code, 1966, section 218.91, is challenged. The section is quoted verbatim in the majority opinion and will not be repeated here. Some of the salient provisions, and omissions, will first be noted.

The statute provides that the Board of Control or the Director of Corrective Institutions may order the transfer of an inmate of the Training School for Boys from that school to the Men's Reformatory at Anamosa. Application to do so must be made to the court. "The county attorney of the said county [where the training school is located] shall appear in support of such application." The order of transfer may be made whenever it is determined that such action will be conducive to the welfare of the other inmates of the school. Welfare of the individual concerned is not mentioned.

The statute does not provide for notice to the inmate, or to anyone else. It does not provide for a hearing. Although it provides that the state shall be represented by the county attorney, it does not provide for counsel for the inmate. Notice, hearing and counsel were all provided here but it would seem that these omissions in the statute are constitutionally impermissible. We have said that a statute rises or falls not on what has been done by its authority but by what may be done by its

authority.. Chicago, R. I. & P. R. Co. v. Liddle, 253 Iowa 402, 112 N.W.2d 852. Here it is quite clear that judicial approval can be secured through ex parte procedures and, in fact, was accomplished without benefit of counsel for. the other two boys. Having no counsel they understandably do not seek certiorari. ·

III. But there are more cogent reasons for dissent to this procedure and to the constitutionality of this statute. As noted by the majority, it was in Wissenburg v. Bradley, 209 Iowa 813, 229 N.W. 205, 67 A. L. R. 1075, that this court upheld our Juvenile Court and care of Neglected, Dependent and Delinquent Children statutes now found in chapters 231 and 232, Code, 1966. In that case attacks similar to those pressed here were urged against the statutes as they applied to initial commitment. Our holding was :

"The appellant in the instant case is not being tried in this proceeding for any crime. The action is, in a sense, a special proceeding provided by statute, wherein the state, by virtue of its authority as *parens patriae*, takes jurisdiction of the incorrigible child, *and commits it, not to jail for punishment, but to a reformatory, for its care, education, and training.* That such a statute and such a proceeding, without a trial by jury, does not violate either the Federal or the state constitutional provisions, has been repeatedly held." (Emphasis added.)

The reasons for such holding are examined in Wissenburg by quotations from other courts:

 "'The whole and only object of such laws is to provide the child with an environment such as will save him to the state and society as a useful and law-abiding citizen, and to give him the educational requirements necessary to attain that end.'
Mill v. Brown, 31. Utah 473 (88 Pac. 609).

"* * * The statute not being criminal in its nature, nor designed for punishment, and the commitment being for the benefit of the child and for its education and reformation, *and to an industrial school or similar institution, the due process of law clause does not, in such a case, require a jury trial.* State v. Scholl, 167 Wis. 504 (167 N.W. 830); Wisconsin Ind. Sch. for

Girls v. Clark County, 103 Wis. 651 (79 N.W. 422); [and many other cases cited] * * *." (Emphasis added.)

It is probable that such enlightened reasoning caused the Federal Court to cite the Wissenburg case in White v. Reid, 125 F. Supp. 647, at 649, as authority for the following statement:

"Petitioner having been committed under Juvenile Court proceedings, the test to be applied is whether the state is presently exercising a reasonable restraint as guardian *in loco parentis*, or whether petitioner is being confined as punishment for an offense. In upholding the Constitutionality of juvenile court acts, the Courts have emphasized not only that the proceedings are noncriminal, but also that the institution to which the delinquent is committed is not of a penal character."

Our statute authorizing transfer to the Men's Reformatory also provides: "Subsequent to a transfer made under this section, the person transferred shall be subject to all the provisions of law and regulations of the institution to which he is transferred, and for the purposes of chapter 745 such person shall be regarded as having been committed to the institution."

No one would contend that the juvenile court could, under our present law, find a juvenile to be delinquent and commit him to the Anamosa Reformatory without offering an opportunity for a jury trial. Can the State, in the name of administrative efficiency do indirectly, what it cannot, in the name of law enforcement, do directly? It would appear that this statute is not within the *parens patriae* spirit that makes the juvenile custodial provisions constitutional.

The juvenile custody has been assumed by the State in an enlightened spirit of helpfulness. The State does not seek to punish him but to train, educate and rehabilitate him. This is the basis of his incarceration in a training school without benefit of a jury trial. This is the basis for the court's action without benefit of defense counsel. This is the basis of the informality and confidentiality of much of the juvenile court's proceedings.

But here the State has admittedly failed. No matter that the failure was the boy's fault—or the State's. Failure there is. What other parent admitting failure can simply pack the child

off to a penal institution without any constitutional safeguards until the child is 21 years old?

The observation that how the boy is treated is completely up to the boy begs the questions here presented. If the boy is considered to have the capability of shouldering that responsibility he cannot be treated as a boy, he must be treated as an adult. That he is not capable of meeting such a challenge is the very reason for his special treatment, for the training—not penalty—theory of the entire system.

IV. Through his attorney this petitioner insists that before he can be placed in the Men's Reformatory at Anamosa, he must be treated as a man. He must be accorded not only the punishment of a man but the constitutional safeguards of a man. It is said that this will do a disservice to him and to all other juveniles for the courts will more often tend to use criminal procedures against juveniles in aggravated cases.

First, there is no showing that this would not be a good development. The juvenile law does not require that all juveniles, under all circumstances, be taken under its wing.

Second, if a minor's activities are so bad that the State facilities cannot handle him as a minor, he should be treated as an adult.

But when this happens he is entitled to be treated as an adult not only in the character of his incarceration but in the judicial process that results in his incarceration.

V. The change in treatment occasioned by transfer from a training school to a reformatory is not a change in degree, it is a change in kind. The record shows that defendant State officials recognize this quite clearly. Attached to the application for authority to transfer are two reports signed by Darrell E. Weigert, Observation Section Director and Dr. Lloyd L. Spencer, Psychiatric Consultant.

Mr. Weigert concluded:

"In reviewing Clifford's file it reveals that about 110 hours of group and individual counseling has been conducted with this particular boy. It is evident that Cliff has gained many strengths and experiences that he has benefited from and will probably never lose, but in view of the recent involvement on

Special Leave and minimal adjustment to the Training School program I feel that he should be considered for possible transfer to the Men's Reformatory at Anamosa."

Dr. Spencer concluded:

"This is a 16-year-old boy with a chronic history of delinquency and an apparent inability to profit from experience or from individual or group counseling. Although it is possible that a program could be worked out which would benefit this boy, our current program and facilities have not been able to accomplish this. I feel that he has really obtained maximum benefit from our existing program.

"* * * I feel that Cliff may be institutionalized because of anti-social activities for some time. He has exhibited or expressed little desire in modifying his current behavior. *I do feel that Clifford possesses the ego strength necessary for him to make an adjustment to life in an adult penal institution without undue difficulties.*" (Emphasis added.)

Faced with such stark evidence of the State's attitude and purpose, this court should not conclude that this juvenile "is not being punished and is not being treated as a prisoner." The opinion of the psychiatrist is far more realistic. If this boy will not be treated as a prisoner, he will not need "ego strength" to adjust to life in an adult penal institution. But the doctor implicitly recognizes that the new custodial care will be different in *kind.* So should we.

The statement that this inmate will not be permitted association with older prisoners is predicated on section 246.36, Code, 1966: "Classification of prisoners. The wardens shall, so far as practicable, prevent prisoners under eighteen years of age from associating with other prisoners." We should not presume from such an equivocal section that the warden at Anamosa has been provided with the facilities and budget to handle juvenile inmates separately. Though the record is silent on the matter, oral argument by the attorneys indicated the contrary.

VI. If other sections of our statutes, or if the factual record here, showed that the reformatory at Anamosa was equipped to continue the treatment and education of this juvenile within the letter and the spirit of our juvenile statutes (albeit, under

far more restrictive circumstances), this dissent would not be filed. But the record does not so show. Nor should the burden to show lack of facilities be on the inmate. The State has the knowledge and the evidence to give the true picture. It should be required to do so if its proposed action is to be allowed. See White v. Reid, 125 F. Supp. 647 at page 650:

"It is true that in both juvenile court and criminal proceedings a person may be deprived of his liberty. It is likewise true in the modern administration of penal institutions increasing emphasis has wisely been placed upon the rehabilitation and training of prisoners as essential elements in a program for crime prevention and correction. Therefore some of the features of penal institutions resemble those of educational, industrial and training schools for juvenile delinquents. The basic function and purpose of penal institutions, however, is punishment as a deterrent to crime. However broad the different methods of discipline, care and treatment that are appropriate for individual prisoners according to age, character, mental condition, and the like, there is a fundamental legal and practical difference in purpose and technique. Unless the institution is one whose primary concern is the individual's moral and physical well-being, unless its facilities are intended for and adapted to guidance, care, education and training rather than punishment, unless its supervision is that of a guardian, not that of a prison guard or jailor, it seems clear a commitment to such institution is by reason of conviction of crime and cannot withstand an assault for violation of fundamental Constitutional safeguards."

VII. The majority's reference to federal cases on this subject overlooks the salient difference between our juvenile law and federal statutes. By the terms of the Federal Juvenile Delinquency Act (which is not the same as the Juvenile Court Act of the District of Columbia, see White v. Reid, 126 F. Supp. 867, 870) the minor must affirmatively consent to come under that act. This has been the basis for approval of transfer of juveniles to federal reformatory in cases similar to the case at hand. But even this reasoning has been rejected by some Federal Courts, thus causing a split of authority on how far the Attorney General of the United States can go in this field.

"* * * Under the federal act it has been argued that the requirements of due process are met by the accusation of crime, the waiver of indictment and jury trial, the finding of delinquency, and the general commitment to the custody of the Attorney General, for here the case has its inception as a criminal proceeding, and the usual safeguards of criminal procedure are available to the juvenile and are voluntarily waived with knowledge that the Attorney General may designate the place and type of correctional institution for confinement. The later transfer from one institution to another, it is said, may well be considered treatment or punishment for the first offense. The difficulty with that argument is that the waiver was for the purpose of a juvenile proceeding, not criminal in nature. A later change without opportunity to be heard, reconverting it into a criminal proceeding, is lacking in due process." United States ex rel. Stinnett v. Hegstrom, supra, 178 F. Supp. 17, 19.

See also Arkadiele v. Markley, 186 F. Supp. 586, where the split of authority is recognized with no real effort to analyze the problem.

Little comfort can be taken from Trimble v. Stone, 187 F. Supp. 483, cited by the majority. That case involved the availability of bail under the Juvenile Court Act of District of Columbia. In passing on the matter Judge Holtzoff observed at page 486:

"A proceeding in the Juvenile Court may terminate in deprivation of liberty for the period of the child's minority, in this case as much as six years. It is urged that a commitment by the Juvenile Court to the National Training School for Boys, which is in effect a reform school for boys, does not involve punishment but merely treatment, while if a person over eighteen, or a juvenile over whom jurisdiction is waived by the Juvenile Court, is committed to a reformatory or a penitentiary, such action is punishment and not treatment. This distinction is not realistic. To say that a boy who is sent to a training school or a reform school by the Government in a paternalistic spirit, is not being punished, while a person who is committed to a reformatory or penitentiary is there for punishment, does not bear the aspect of reality. All incarceration consequent on an in-

fraction of the law combines deterrence, punishment, and treatment for rehabilitation in varying degrees. In some instances emphasis on one element is greater than on others, but in every case each is present to some extent."

And at page 488, "It was the beneficent purpose of the progressive legislation creating juvenile courts to ameliorate some of the rigidity and formality of the criminal law in cases in which the accused is a juvenile. The objective was to introduce more leniency, humanity, and informality in dealing with juvenile offenders. The ultimate end was to confer new rights and privileges on juvenile offenders beyond those to which they had been previously entitled, as well as in addition to those possessed by adult offenders. It is inconceivable that it was the intention to deprive juveniles of rights that they would have had if they were treated on the same basis as adult defendants."

White v. Reid, noted above, was the subject of a second opinion found at 126 F. Supp. 867. In that case the court concluded at page 871:

"The Court, accordingly, concludes that both Constitution and statute forbid the transfer of a youth committed under the Juvenile Court Act to any institution designed for the custody of persons convicted of crime, including the Federal Correctional Institution at Ashland, Kentucky, and the commingling of such juveniles with criminals."

In United States ex rel. Stinnett v. Hegstrom, 178 F. Supp. 17, supra, the court notes at page 20 that in neither Suarez v. Wilkinson, 133 F. Supp. 38, nor United States v. McCoy, 150 F. Supp. 237 (relied upon by the majority), were the constitutional issues surrounding this problem raised. In that case the court concludes:

"The discretion given the Attorney General by Congress to designate the institution and to transfer from the National Training School for Boys when deemed proper, can be only to an institution for the care and custody of juveniles, with facilities in some degree comparable to the National Training School. To hold otherwise would be to permit confinement for crime without a right to trial. This would be violative of the constitutional right to due process under the Fifth Amendment and to the

guaranties of fair trial of the Sixth Amendment. Some or all of petitioners are admittedly disciplinary problems. They are in custody however as juveniles and have not been tried and sentenced for crime committed before they were placed in custody as juveniles, or for any offense since committed while in such custody. They must be confined only with other juveniles until and unless charged with and convicted of crime."

In regard to the need for constant reminder of constitutional issues in juvenile matters the most authoritative, and perhaps the latest, word comes from the Supreme Court of the United States, Mr. Justice Fortas speaking:

"While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, including that of the District of Columbia, lack the personnel, facilities and techniques to perform adequately as representatives of the State in a *parens patriae* capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." Kent v. United States, 383 U. S. 541, 555, 86 S. Ct. 1045 at page 1054, 16 L. Ed.2d 84, 94.

On balance, it would seem that the weight of federal authority is against the result that we reach here.

VIII. Consideration of this matter has not been confined to the courts:

"It is not only illogical but blatantly inconsistent with fair treatment of the child to argue, on one hand, that the safeguards of criminal procedure are unnecessary in noncriminal cases and then on the other hand, to apply criminal sanctions in such cases. Not only do these practices deny the youngster the protection of criminal proceedings, but also they undermine the philosophy of the whole juvenile court movement." Delinquent

Children in Penal Institutions, p. 10, U. S. Dept. of Health, Education & Welfare, Children's Bureau, Publ. No. 415-1964.

See also the article by Judge Robert Gardner, Judge of the Superior Court (Orange County, Cal.), in 52 American Bar Association Journal (October 1966), page 923.

IX. It is significant that the trial court felt that it had no discretion in this matter. That it was, in fact, just a "rubber stamp". Assuming that the statute is constitutional, the trial court was probably right because the decision under the statute turns on internal institutional administrative needs.

The strength of the presumption of the validity of the acts of the government is based on the right and the necessity of the State to protect itself and to operate effectively. But the safeguards of the constitutional sections prohibiting certain acts against individuals are based on the recognition that the State cannot go too far in its own behalf. It cannot ignore the individual rights declared by the people to be constitutionally protected. When the State does so, by the operation of any of its branches of government, it is our duty to interfere on behalf of the individual.

This boy may well deserve to be incarcerated in an adult penal institution; or, to put it differently, the interest of the State may well demand such treatment. If that be true the State can, and I believe must, charge him with one or more of the crimes obliquely referred to in the school's report and noted by the majority. The final decision must then await the regular judicial outcome of that process. That is the only process that can be termed *due process* in this situation.

I would declare section 218.91 of Code of 1966 unconstitutional, grant the writ, and remand the case to the district court for constitutional disposition.

MASON and RAWLINGS, JJ., join in this dissent.